[Civ. No. 66529. Second Dist., Div. Three. Aug. 29, 1983.]

McMAHAN'S OF SANTA MONICA, Plaintiff and Appellant;
AETNA LIFE AND CASUALTY COMPANY,
Plaintiff and Respondent, v.
CITY OF SANTA MONICA, Defendant and Appellant.

COUNSEL

Breidenbach, Swainston, Yokaitis & Crispo, Howard L. Halm and Thomas A. Kearney for Plaintiff and Appellant.

Robert M. Myers, City Attorney, Stephen S. Stark, Assistant City Attorney, Yvonne Binstock, Chief Deputy City Attorney, Jeffrey W. Holtzman and Karl M. Manheim, Deputy City Attorneys, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

## OPINION

**LUI, J.**—Defendant and appellant City of Santa Monica (the City) appeals from that portion of the judgment entered following a bifurcated trial in which the trial court held the City liable in inverse condemnation. Plaintiff and cross-appellant McMahan's of Santa Monica, a limited partnership (McMahan's) appeals from the judgment entered after the liability phase of the trial, contending that the damage award was inadequate due to improper jury instructions and was not supported by the evidence. For the reasons stated below, we affirm the judgment of the trial court in its entirety.

### FACTUAL AND PROCEDURAL BACKGROUND

McMahan's operates a furniture store on Fourth Street in Santa Monica. The City owns and operates a water distribution system which included an unlined water main that ran under Fourth Court, the alleyway behind McMahan's store. The water main broke during the early morning hours of July 20, 1975. A 75-foot geyser spewed out of the break and damaged McMahan's building and personal property.

Aetna Life and Casualty Company (Aetna) was McMahan's insurer on the date of the damage; it paid McMahan's claims and became subrogated to McMahan's rights to the extent of such payment. Aetna and McMahan's then filed a joint suit against the City seeking damages of $202,800.57. The complaint stated five causes of action: inverse condemnation, negligence, strict liability, trespass and nuisance.

The City's insurance with American Reserve Insurance Company (American Reserve) would have covered claims and judgments in all of McMahan's and Aetna's causes of action except inverse condemnation. However, on January 10, 1978, American Reserve went into liquidation. Pursuant to section 1063 of the California Insurance Code, the California Insurance Guarantee Association (CIGA) assumed responsibility for all claims insured by American Reserve. Since only the original claimant under the insurance policy can collect from CIGA (Ins. Code, § 1063.1, subd. (c) (7)(b)), Aetna and McMahan's voluntarily dismissed all causes of action except the inverse condemnation cause. Counsel for Aetna and McMahan's informed the trial court that CIGA had paid his clients $5,000 in settlement of the causes of action that were dismissed.

During the liability phase of the trial, the City presented evidence that it had an ongoing water main replacement program. However, plaintiffs' evi-

dence included a study conducted in early 1975 by the City's water division, which acknowledged that the City had a "hundred miles of badly deteriorated" mains in the system and that, even at an accelerated rate, adequate replacement would take 30 years. The City had installed the unlined water main under Fourth Court in 1924. Thus, at the time of the break, the water main had been in use for 51 years in spite of the fact that the assumed lifetime of the main was 40 years.

The trial court found that the water main had developed severe corrosion on both its interior and exterior surfaces. Specifically, the exterior of the water main had developed two localized corrosion "bowls" or areas in which the corrosion had eaten away the surface of the water main. According to expert testimony, these bowls decreased the wall's thickness to the point where "failure of the [main] was imminent and that almost any internal pressure disturbance would accelerate that failure" without any large surge of pressure.

The plaintiffs' expert witness, Frank Swift, a consulting engineer in water supply and hydraulics, testified that his tests of the corroded material from the Fourth Court main revealed a complete lack of strength. He concluded that "the deep corrosion of the pipe" caused it to break.

The City produced evidence that, in the late night and early morning hours of July 19 and 20, vandals had opened a number of fire hydrants in the area near McMahan's. The City suggested that these openings caused "water hammers" or high pressure shock waves that damaged the pipe and resulted in the geyser. Despite this evidence, the trial court found that the main's corrosion was a substantial cause of the break, and concluded as a matter of law that "[McMahan's] property suffered physical damage proximately caused by the water main maintained as deliberately planned and designed by [the City]." The trial court found in favor of plaintiffs on the liability phase of the inverse condemnation cause of action.

After the liability phase, a jury trial was conducted to determine the question of damages. The jury returned its verdict, finding that McMahan's had suffered loss of building and equipment totalling $55,930.71 and damaged inventory of $40,625.53, or a total of $96,556.24. Since Aetna and McMahans' had previously stipulated that any award in excess of $95,424.22 would go to McMahan's; McMahan's received $1,132.02 plus interest of $434.92, or a total of $1,566.94; Aetna received the balance, or $95,424.22, plus interest of $36,664. The trial court granted Aetna costs of $46,403.16, making Aetna's total recovery $178,491.88.

Subsequently, McMahan's moved for a new trial on the damage phase, contending that the jury returned an inadequate award. The trial court denied the motion. The City and McMahan's filed timely notices of appeal.

CONTENTIONS ON APPEAL

City contends that:

1. Government Code section 850.4 provides the City with absolute immunity in situations where private property is damaged by fire protection equipment or facilities and that the water pipe in question was such equipment; and

2. Aetna, as subrogee-insurer, lacks standing to sue in inverse condemnation because it was not a property owner within the meaning of article I, section 19, of the California Constitution;

3. The situation presented does not support a cause of action in inverse condemnation.

McMahan's contends in its cross-appeal that:

1. The trial court erred in refusing to give their offered special instruction on the appropriate measure of damages for McMahan's inventory loss; and

2. The jury's damage award for McMahan's inventory loss was inadequate.

I

*The City Failed to Raise the Immunity Provided by*
*Government Code Section 850.4 and it Was Waived*

The City failed to plead and prove the immunity provided by Government Code section 850.4. ■ Such an immunity is considered an affirmative defense and must be pled and proven or is deemed waived. (*De La Rosa* v. *City of San Bernardino* (1971) 16 Cal.App.3d 739, 747 [94 Cal.Rptr. 175]; Code Civ. Proc., § 431.30, subd. (b)(2) and Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 3.76 at p. 301.) Therefore, we need not decide the question of whether the facts presented in the instant appeal would have shown immunity under the above section.

## II

*Aetna Has Standing to Assert Recovery in Inverse
Condemnation as Subrogee of McMahan's*

 The City argues that Aetna lacks standing to seek recovery in inverse condemnation, contending that article I, section 19, of the California Constitution[1] limits such recovery to the damaged property owner. We reject this contention.

We are persuaded to address the issue of Aetna's standing in spite of the fact that the City raised this issue for the first time on appeal and stipulated in the trial court that "plaintiffs" had an interest in the real and personal property damaged as a result of the breakage of the water main. No appellate decision in this state has addressed the precise question of whether an insurer, who is subrogated to the rights of a property owner by virtue of a provision in a policy of insurance, may maintain an action in inverse condemnation seeking recovery of claims it paid its insured.

Article I, section 19, mandates that just compensation be paid when private property is taken or damaged for public use. When a public entity has taken or damaged property, inverse condemnation provides a remedy by which the property owner can obtain just compensation. (*Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720, 732 [84 Cal.Rptr. 11].)

 Courts have not limited recovery in inverse condemnation to owners of a fee simple interest. To be constitutionally entitled to compensation, the plaintiff must only show that he owned a property interest which had been taken by the state. (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 687 [119 Cal.Rptr. 491, 532 P.2d 139].) Interests which have been deemed sufficient to give a plaintiff standing include the holder of an unexercised option to purchase property (*County of San Diego* v. *Miller, supra*), a mortgagor whose interest has been foreclosed (*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]), and the executor of a property owner's estate in which the decedent held an interest with a spouse (*Blau* v. *City of Los Angeles* (1973) 32 Cal.App.3d 77 [107

---

[1]Article I, section 19 of the California Constitution states: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."

Article I, section 19 was formerly article I, section 14. This latter section was repealed November 5, 1974.

Cal.Rptr. 727]). More specifically, *Travelers Indem. Co.* v. *Ingebretsen* (1974) 38 Cal.App.3d 858, 864 [113 Cal.Rptr. 679], acknowledged an insurer-subrogee's right to seek recovery in inverse condemnation either in the insurer's own name or in the name of its insured. *Ingebretsen* arose out of an underlying inverse condemnation suit which was the subject of the appeal in *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]. In *Ingebretsen,* the plaintiff homeowners obtained compensation from the County for landslide damages caused by County improvements. Many of the homeowners were insured. Pursuant to their insurance policies, their insurers reimbursed them for their damages. Each policy contained a standard subrogation clause whereby the insurers were entitled to recover monies paid to the insureds by the party responsible for the loss. The insurers were not named as plaintiffs in the inverse condemnation action, although attorneys for both insurers and insureds collaborated in the insureds' lawsuit. Following judgment in favor of the homeowners, the insurers were forced to file suit against the insureds to enforce their subrogation interests. (*Ingebretsen, supra,* 38 Cal.App.3d at pp. 861-862.)

*Ingebretsen* held that the insurers were not required to intervene in the inverse condemnation action against the county, but instead had the option either of joining in that suit or of obtaining reimbursement from their insureds after judgment. The *Ingebretsen* court stated at pages 864-865 that, "[u]nder the assignment, [the insurers] had the right to pursue their remedy either in their own name or in the name of the [insureds]. The important point is that [the insureds] brought an action against the County of Los Angeles for the entire amount of the loss. The fact that [the insurers] made payments under the insurance policy to [the insureds] and obtained subrogation agreements is sufficient to establish their right to a corresponding amount from that judgment."

In the instant appeal, Aetna paid McMahan's pursuant to its policy and thereby became subrogated to McMahan's rights. Aetna could have allowed McMahan's to pursue and recover a judgment for their loss in McMahan's own name and then filed suit against McMahan's to enforce its subrogation interest. Instead, Aetna chose to join as co-plaintiff in the inverse condemnation action. We see no reason to have required Aetna to proceed only after a conclusion of McMahan's suit against the City. To hold otherwise would be to require an unnecessary second action. *Ingebretsen* holds that an insurer may enforce an action against its insured. We hold that the insurer may join the insured in the action seeking recovery in inverse condemnation.

The City, in its reply brief, asks us to examine whether a subrogee-insurer should be guaranteed standing as a matter of public policy. The City argues that the municipalities are under great financial restraints in light of Proposition 13 (Cal. Const., art. XIII A, passed by voters June 6, 1978) and that case law which imposes strict liability in inverse condemnation actions is too harsh and should be reappraised.

While we recognize that Proposition 13 has caused financial hardships on government entities in the state, we do not accept the City's proposal that this initiative and the resulting financial hardships on local governments is justification for a reexamination of the strict liability standard applicable in inverse condemnation actions. Such financial difficulties are more appropriately addressed to the legislative and executive branches of the State's government, and not to the judiciary.

III

*The Judgment for Inverse Condemnation Was Proper*
*Under the Present Factual Situation*

The City contends that the facts of the instant appeal do not support a cause of action for inverse condemnation.

■ Although inverse condemnation is a constitutional remedy, the liability of public entities for unintended physical damage to private property has evolved as a body of law drawn primarily from the principles of tort and property law. (See Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 438.) Prior to 1965, most California appellate decisions sustaining inverse liability for unintended physical injury to property were predicated expressly on a fault rationale that was grounded upon the foreseeability of damages as a consequence of the construction or operation of a public project as deliberately planned. (*Id.*, at p. 438.)

In 1965, our Supreme Court decided in *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, that liability may exist on inverse condemnation grounds in the absence of fault. In *Albers,* a major landslide occurred in the Palos Verdes area of Los Angeles County, triggered by pressure from large quantities of dirt deposited by the county during the construction of a road through the area. The slide destroyed more than $5 million in residential properties and improvements. The county was aware that the area constituted a prehistoric slide site; however, competent geological reports had concluded that the land had stabilized and further that slides were not rea-

sonably expected. (*Id.*, at p. 255.) In a suit against the county for damages, the trial court specifically found that there was an absence of negligent or wrongful conduct on the part of the county. However, the trial court awarded judgment to the plaintiff property owners under the theory of inverse condemnation.

In upholding the judgment of the trial court, our Supreme Court concluded that if the county's actions as planned and carried out had led to the injury, then the property owners could recover despite the unforeseeability of the landslide, stating, "any actual physical injury to real property proximately caused by the improvement as deliberately designed and constructed is compensable under article I, section 14, of our Constitution whether foreseeable or not." (*Id.*, at pp. 263-264.)

 In the present appeal, City contends that the damage to McMahan's was not caused by a public improvement as deliberately planned and built.

The trial court found that the water main in question was installed in 1924 and was some 51 years old at the time of the break; that the assumed anticipated lifetime of the unlined water mains was 40 years; that the presence of corrosion was a substantial cause of the break in the water main; that the water main's break occurred at two separate points where external loss of materials occurred due to corrosive soil conditions; that the corrosion of the water main was so extensive that a rupture was imminent without the need for any large surge of pressure to cause it to break; and that the water main did not break because of a water hammer or the activities of the juveniles who turned on the fire hydrant located in the vicinity of the McMahan's store.

In *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591 [168 Cal.Rptr. 750], a judgment in favor of the City of San Rafael was reversed on appeal. The City of San Rafael caused a subterranean drainage pipe to be installed along a street and onto a vacant lot sometime prior to 1942. In 1949, the city replaced a portion of the pipe located on the lot in question with a larger pipe. Later the then owner of the lot extended the pipe beyond the lot and buried it in a ditch after consultation with the city's surveyor. In 1952, a home was constructed on the lot over the buried drainage pipe. In 1973, plaintiffs purchased the residence without any knowledge of the subterranean drainage pipe. Some 21 months later, during a heavy rainstorm, a large amount of water gushed up from the pipe beneath the basement of the residence, causing substantial damage to the property. Plaintiffs commenced an inverse condemnation action against the City of San Rafael. In reversing the trial court's judgment in favor of the city, the *Marin* opinion

held that the plaintiffs' damage had proximately resulted from the city's maintenance and use of a public improvement as deliberately planned and designed and that the city had knowledge of the continued use of the pipe for drainage purposes over many years.

More recently, in *Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917 [190 Cal.Rptr. 595], the First District reversed the trial court's grant of summary judgment to the defendant City of Sausalito in an inverse condemnation action brought by a homeowner for damages caused by a ruptured storm drainage system. The rupture of a gutter had allowed surface waters to seep into the subsurface soil on Yee's land, causing massive soil subsidence. The trial court had based its decision on the theory that the seepage of the surface water had not occurred as a direct function of the gutter as originally designed and constructed.

*Yee* held that plaintiff had stated a valid cause of action in inverse condemnation and that inverse liability could be imposed on the City of Sausalito for property damages arising from the failure of a public improvement to operate as originally intended. (*Id.*, at p. 919.)

Here, the City argues that a tort action cannot be elevated to the constitutional remedy of inverse condemnation merely because a public entity is peripherally involved in an incident resulting in damage to private property. The City's argument misses the intent of the *Marin* and *Yee* decisions. "The principle of inverse condemnation will not subject a public entity to general tort liability. (See *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 286 [289 P.2d 1].) 'Inverse condemnation is the remedy only for such injury to private property as results from "a deliberate act carrying with it the purpose of fulfilling one or another of the public objects of the project as a whole" [citation]. Neither "negligent acts committed during the routine day to day operation of the public improvement," nor "negligence in the routine operation having no relation to the function of the project as conceived" gives rise to a claim in inverse condemnation [citation].' (*Eli* v. *State of California* (1975) 46 Cal.App.3d 233, 235 [120 Cal.Rptr. 63]; citing *Bauer, supra,* at p. 286; *Sheffet* v. *County of Los Angeles, supra,* 3 Cal.App.3d 720, 739; *Kambish* v. *Santa Clara Valley Water Conservation District* (1960) 185 Cal.App.2d 107, 111 [8 Cal.Rptr. 215].)" (*Yee, supra,* 141 Cal.App.3d at p. 920.)

The holding in *Eli, supra,* 46 Cal.App.3d 233, was that a San Quentin inmate did not state a cause of action for inverse condemnation arising out of the loss of his personal property "[a]lthough the loss of [Eli's] property results indirectly from the obviously public purpose of establishing and ad-

ministering correctional facilities, it in no way relates to either the planning of the prison or its use as a public improvement. That loss resulted, rather, from careless (possibly wilful) error of minor public employees in routine day to day operation of the prison system, rather than from any defect in the planned construction or operation of that system. At most, as apparently recognized by the Board of Control, it gives rise to an action for conversion." (*Id.*, at p. 236.)

In the present appeal, the City relies on *Eli* and contends that the rupture of the pipe was due to negligent maintenance and daily operations, and was not due to a deliberate plan of construction. The City further contends that negligent maintenance is not a deliberate act and, therefore, cannot constitute a taking. City's reliance on *Eli* is misplaced.

Evidence was produced at trial that the City did have a maintenance program which was known to be inadequate. A budget report prepared for the year 1975 by the City's administrative water engineer stated that, at the then rate of water main replacement being utilized by City, it would take at least 88 years to replace all unlined mains in the city. In addition, testimony disclosed that "40 years is their assumed lifetime." Moreover, a water rate study prepared on behalf of the City in 1975 included a separate section on water main replacement which provided: "Currently the City has more than a hundred miles of badly deteriorated or undersized, unlined mains in the system. The present rate of replacement will require more than 40 years to completion. Present plans are to accelerate the rate of replacement to a point where completion can be achieved in 30 years, which will be a more reasonable life expectancy for water mains. Water mains needing replacement are in excess of 20 years old; therefore, without an accelerated program of replacement, the system will continue to deteriorate."

The rule in *Albers* that damage must result from the project as "deliberately designed and constructed" applies to situations in which the damage occurs subsequent to the construction of the improvement. In order to hold a public entity liable, maintenance must involve "a deliberate act which has as its object the direct or indirect accomplishment of the purpose of the improvement as a whole." (*Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 285 [289 P.2d 1].)

*Bauer* involved the county storm drain district's construction of a system of ditches and levees diverting the waters of a natural water course away from their natural stream. In its natural course the stream flowed in a direction away from plaintiffs Bauers' land by approximately one-quarter mile. Because the water course in its natural state was lower than the

Bauers' land, the natural overflow, if any, would flow away from and never toward Bauers' land. Between 11 and 13 years later, the lower bank at the far side of the ditch was raised by the district and a quantity of debris and soil was accumulated in the bottom of the ditch. With the lower bank of the ditch raised, its highest points were above the level of Bauers' land. A bank or levee was constructed upon the bank nearest Bauers' land which would keep the waters in the ditch or continue to permit them to overflow only in the direction away from Bauers' land. Bauers alleged that as a proximate result of this negligent construction and maintenance of the ditch, the levees overflowed onto and damaged their property.

The concept of "maintenance" and "construction" are synonymous for purposes of interpreting article I, section 19. (*Bauer, supra,* 45 Cal.2d at p. 285.) *Bauer* states that "[t]he rather obscure line between the concepts of 'construction' and 'maintenance' is disclosed by any attempt to define them in mutually exclusive terms and to characterize the raising of a bank of an existing ditch as one or the other. If the 'maintenance' consists of an alteration of the ditch by raising one of the banks, then in a material sense 'maintenance' becomes a species of 'construction.' . . . The defendants' argument that damage from maintenance is beyond the purview of [art. I] section [19] invites an artificial distinction which would turn simply upon the passage of time between the original construction and the subsequent alteration and must therefore be rejected." (*Id.,* at p. 285.) *Bauer* also reasoned that "[t]he consequences of faulty maintenance may assume public importance equal in some instances to the original construction. The ultimate objects of construction and maintenance are similar if not coextensive." (*Ibid.*)

Thus, whether the City's program of water main installation and replacement is characterized as "construction" or "maintenance," the fact remains that it was inadequate and contributed to the break due to corrosion of the Fourth Court main. The City's knowledge of the limited life of such mains and failure to adequately guard against such breaks caused by corrosion is as much a "deliberate" act as existed in *Albers, supra,* 62 Cal.2d 250.

The City's reliance on *Hayashi* v. *Alameda County Flood Control* (1959) 167 Cal.App.2d 584 [334 P.2d 1048], is misplaced. In *Hayashi,* plaintiffs sued defendant flood control district for inverse condemnation, alleging that debris and water flowed onto their land from a break in a levee constructed and maintained by the district. Plaintiffs charged the district with negligence in failing properly to remove the debris and to repair the levee, although they did not charge that the district caused the original break or that there had been a defect in the design or construction. Plaintiffs had given notice

to the district 21 days prior to the damage to their land, yet no repairs were made. *Hayashi* concluded that such negligent failure to act after receipt of notice of the break, constituted a general tort claim and not a taking of property for public use.

Unlike *Hayashi,* the present appeal does not involve the negligent failure to repair a known break. Evidence at trial indicates that the break and the resulting damage occurred over a short span of time. Furthermore, the City's own witness indicated that a major criterion for the maintenance program in determining whether to replace the pipes was the number and severity of the leaks discovered over a period of time.

■ The fundamental justification for inverse condemnation liability is that the public entity, acting in furtherance of public objectives, is taking a calculated risk that damage to private property may occur. (See Van Alstyne, *Inverse Condemnation: Unintended Physical Damage, supra,* 20 Hastings L.J. at p. 491.) Professor Van Alstyne has observed that "practically every governmental decision to construct a public improvement involves, however remotely, at least some unforeseeable risks that physical damage to property may result. In the presumably rare instance where substantial damage does in fact eventuate 'directly' from the project [fn. omitted], and is capable of more equitable absorption by the beneficiaries of the project (ordinarily either taxpayers or consumers of service paid for by fees or charges) than by the injured owner [fn. omitted], absence of fault may be treated as simply an insufficient justification for shifting the unforeseeable loss from the project that caused it to be [sic] the equally innocent owners." (*Id.,* at pp. 493-495.) Van Alstyne also noted that even with foreseeable damages, a balancing process occurs relating the practicability of preventive measures and the costs of such prevention, stating: "The governmental decision to proceed with the project without incorporating the essential precautionary modifications in the plan thus represents more than a mere determination that effective damage prevention is not expedient. It is also a deliberate policy decision to shift the risk of future loss to private property owners rather than to absorb such risk as a part of the cost of the improvement paid for by the community at large. In effect, that decision treats private damage costs, anticipated or anticipatable, but uncertain in timing or amount or both, as a deferred risk of the project. If and when they materialize, however, the present analysis suggests that those costs should be recognized as planned costs inflicted in the interest of fulfilling the public purpose of the project and thus subject to a duty to pay just compensation." (*Id.,* at pp. 491-492.)

■ In the instant appeal, the City was taking a calculated risk by adopting a plan of pipe replacement and maintenance that it knew was inadequate.

The City's plan of replacement of the water mains reflected the deferred risks of the project both foreseeable and unforeseeable, and it is proper to require the City to bear the loss when the damage occurs.

In *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441], our Supreme Court explained that "the underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements.'" (*Id.*, at p. 303, citing *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 350 [144 P.2d 818].) This "cost spreading" purpose is well illustrated in an Iowa Supreme Court case cited with approval by the *Holtz* court: "In *Lubin* v. *Iowa City* (1964) 257 Iowa 383, 391 [131 N.W.2d 765, 770] the city's 80-year-old water main, located six feet below the ground without a reasonable inspection capability, broke and flooded the plaintiffs' basement. The court stated: 'A city . . . so operating knows that eventually a break will occur, water will escape and in all probability flow onto the premises of another with resulting damage. . . . *The risk from such a method of operation should be borne by the water supplier who is in a position to spread the cost among the consumers who are in fact the true beneficiaries of this practice and of the resulting savings in inspection and maintenance costs.*' [Citations.]" (*Holtz, supra,* 3 Cal.3d at p. 311, fn. 17.) (Italics added.)

In light of the trend in recent appellate decisions such as *Yee* and *Marin,* we conclude that the situation at bar presents a valid cause of action for inverse condemnation.

IV

*Substantial Evidence Supports the Trial Court's Finding of Proximate Cause*

Although the City does not challenge the sufficiency of the evidence to support the trial court's determination of liability directly, it argues that the trial court "glossed over" the real causes of the water main rupture which included the criminal intervention of third parties as well as its own negligence. However, there was ample evidence to support the trial court's conclusion that the damage to McMahan's property had been "proximately caused by the main maintained as deliberately planned and designed by [the City]."

The trial court ruled out the City's theory that the water main broke as a result of a water hammer or the activities of the vandals who turned on the

fire hydrants in the vicinity of the McMahan's store. ▓▓▓ As stated in *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183], "the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion" reached by the court below. Furthermore, "in a case tried without a jury, the trial judge is the sole arbiter of all conflicts in evidence, . . . [and] he may draw or may refuse to draw inferences reasonably deducible from the evidence." (*Frankhenheimer* v. *Frankhenheimer* (1964) 231 Cal.App.2d 101, 107 [41 Cal.Rptr. 636].) There is abundant evidence to support the trial court's determination of proximate causation.[2]

## V

### *The Trial Court Properly Denied Requests for a Special Instruction*

▓▓▓ The thrust of McMahan's cross-appeal is that the proper standard of "just compensation" for a retailer in an inverse condemnation is the retail value and not wholesale value of personal property damaged. This question also appears to be of first impression in this state.

The trial court instructed the jury as follows: "The fair market value of the inventory damaged is the highest price on the date of damage that would be agreed to by a seller who is willing to sell but who is under no particular or urgent necessity for so doing and who is not obliged to sell, and a buyer who is ready, willing, and able to buy but who is under no particular necessity for so doing, each dealing with the other with full knowledge of all

---

[2]Professor Van Alstyne has suggested that the concept of "proximate cause" combined with the elimination of the element of foreseeability within the context of inverse condemnation, has led to some confusion and criticism. (See Van Alstyne, *Inverse Condemnation, supra,* 20 Hastings L.J. at p. 435. See also *Ingram* v. *City of Redondo Beach* (1975) 45 Cal.App.3d 628, 632 [119 Cal.Rptr. 688], citing Van Alstyne with approval. In *Blau* v. *City of Los Angeles* (1973) 32 Cal.App.3d 77 [107 Cal.Rptr. 727], this Division reversed a judgment in favor of the City, finding that the manifest result of the instructions given was to preclude plaintiff from recovery if they or their predecessors in title were found to have made some "substantial" contribution to the forces which produced the landslide, even though the street development was also found to be a substantial contributing factor, thus failing to accord recognition to the fact that liability may be grounded on a concurring substantial cause.

In *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 304, at footnote 9, our Supreme Court noted Professor Van Alstyne's suggestion to replace the proximate cause in favor of the substantial factors rule but declined "any change in language to a case which better reveals the competing considerations on the causation issue."

In determining that the evidence supports the trial court's determination of proximate causation, we note that the trial court's findings are equally supportive on the theory of "substantial" contributing factors, i.e., that the corrosion of the pipes was a substantial factor causing the breakage of the pipes even though there may have been other concurrent causal factors, such as a water hammer or the act of the vandals.

the uses and purposes for which the property is reasonably adaptable and available." The language of the court's instruction is patterned after BAJI No. 11.73 and section 1263.320, subdivision (a), of the Code of Civil Procedure.

McMahan's requested the following special instruction: "As to the merchandise losses suffered by plaintiffs, the compensation for those losses may be based on the *retail value* of the merchandise less average discounts." (Italics added.)

McMahan's argues that it was entitled to the special instruction because its measure of damage was retail and not wholesale value. We disagree.

■ The constitutional requirement of just compensation applies to both eminent domain and inverse condemnation actions. (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 43.) The usual measure of just compensation is the fair market value of the property taken. (*People* ex rel. *Dept. Pub. Wks.* v. *Lynbar, Inc.* (1967) 253 Cal.App.2d 870, 880 [62 Cal.Rptr. 320].) The right to just compensation applies to the taking or damaging of both real and personal property. (*Sutfin* v. *State of California* (1968) 261 Cal.App.2d 50 [67 Cal.Rptr. 665].)

■ We need only decide whether McMahan's was entitled to the retail or wholesale value of its damaged furniture because at trial McMahan's did not seek recovery of lost profits for the time its store was closed for repairs, i.e., costs for business interruption. McMahan's business was operational 30 days after the incident.

Unlike real property, the items of McMahan's inventory that were damaged were not unique, but completely fungible and readily replaceable. The chairman of the board of directors of McMahan's testified that the damaged inventory was part of a "model stock of inventory" carried by other McMahan's affiliated stores, that no undue hardship was incurred in replacing the damaged merchandise with other identical merchandise, and that McMahan's purchased such merchandise at the cost figures testified to at trial.

To award McMahan's retail value instead of wholesale value would result in a windfall to McMahan's—an award in excess of just compensation sufficient to make McMahan's whole. Here, the proper standard of fair market value is the wholesale value. This is what a retailer, whose inventory of nonunique, fungible, and readily replaceable goods is damaged as a result of an act of inverse condemnation, should receive.

The wholesale standard which we adopt in this decision is consistent with section 911, comment d, of the Restatement of the Law of Torts (1939)

which provides as follows at pages 566-567: "*d. Wholesale or retail value.* From the time when a chattel is manufactured to the time of its actual use, there may be many markets in which it is sold. Thus, different prices are paid by the wholesaler, the retail dealer and the consumer. *Since the measure of recovery is determined by the harm done, the market which determines the measure of recovery by a person whose goods have been taken, destroyed or detained is that to which he would have to resort in order to replace the subject matter.* Thus the consumer can recover the retail price; *the retail dealer, the wholesale price.* The manufacturer, who does not buy in a market, receives his selling price. Damages for the profits which the wholesale dealer or the retail dealer would normally anticipate from a sale are not ordinarily allowed. . . ." (Italics added.) (See also *Hedderman* v. *Robert Hall of Waterbury* (1958) 145 Conn. 410 [144 A.2d 60, 63] wherein a retailer whose property was damaged as a result of faulty installation of a roof was not entitled to recover the full retail value of the articles damaged.)

In the present appeal, evidence of the wholesale value of the damaged inventory was presented in terms of McMahan's replacement cost. This evidence was not controverted. The jury was also presented evidence of the retail value less normal discounts of such inventory. The jury's award for the inventory damages was consistent with the evidence presented as to wholesale replacement cost. In view of our determination that the wholesale value was the proper standard, the court did not err in refusing the special instruction.

For the foregoing reasons, we affirm the judgment entered below in its entirety. McMahan's to recover costs on appeal.

Klein, P. J., and Danielson, J., concurred.

The petitions of both the appellants for a hearing by the Supreme Court were denied December 14, 1983.