Filed 5/18/18 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LISA WILLIAMS et al., | |
|    Plaintiffs and Appellants, | G053002 |
|       v. | (Super. Ct. No. 30-2011-00519887) |
| MOULTON NIGUEL WATER DISTRICT et al., | ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |
|    Defendants and Respondents. | |

It is ordered that the opinion filed herein on May 3, 2018, be modified as follows:

On page 1, third paragraph, in the counsel listing for defendant and respondent Metropolitan Water District of Southern California, the surname "Skully" is changed to "Scully" so that the attorney name reads "Marcia Scully."

There is no change in the judgment.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.

Filed 5/3/18 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LISA WILLIAMS et al., | |
|    Plaintiffs and Appellants, | G053002 |
|      v. | (Super. Ct. No. 30-2011-00519887) |
| MOULTON NIGUEL WATER DISTRICT et al., | O P I N I O N |
|    Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Thierry Patrick Colaw, Judge. Affirmed.

Callahan, Thompson, Sherman & Caudill; Robert W. Thompson, Brett E. Bitzer; Lee A. Sherman and Erin M. Mallon for Plaintiffs and Appellants.

Marcia Skully, Heather C. Beatty, Jill C. Teraoka, Heriberto F. Diaz; Greines, Martin, Stein & Richland and Timothy T. Coates for Defendant and Respondent Metropolitan Water District of Southern California.

Lewis, Brisbois, Bisgaard & Smith; Charles L. Harris, Stephen L. Culp and Gary M. Lape for Defendant and Respondent Irvine Ranch Water District.

Law Offices of Robert J. Gokoo and Robert J. Gokoo for Defendant and Respondent Moulton Niguel Water District.

Best Best & Krieger and Jeffrey V. Dunn for Amicus Curiae Association of California Water Agencies, League of California Cities, San Diego County Water Authority, Las Virgenes Municipal Water District, Upper San Gabriel Valley Municipal Water District, Municipal Water District of Orange County, Foothill Municipal Water District, and West Basin Municipal Water District.

\*          \*          \*

Plaintiff homeowners allege the copper piping in their homes was damaged by a chemical the defendant water districts added to tap water. Adding the chemical was authorized by regulation, however, and it is undisputed that the water districts complied with all statutory and regulatory standards. After a bifurcated bench trial on certain legal issues, the trial court entered judgment for the water districts, finding plaintiffs' causes of action for nuisance and inverse condemnation were preempted by federal and state laws, and otherwise insufficient on the merits. The plaintiff homeowners appealed. For reasons we explain below, we conclude the plaintiffs' causes of action fail on the merits, and thus affirm.

PROCEDURAL HISTORY

Plaintiffs Lisa Williams and Shawn Williams filed a putative class action complaint against defendants Metropolitan Water District of Southern California (Metropolitan) and Irvine Ranch Water District (Irvine Ranch). Plaintiffs Steven Eckert and Joseph Repetti filed a putative class action complaint against Metropolitan and Moulton Niguel Water District (Moulton Niguel). Plaintiffs Anthony Caito and Enrique

2

Ceniceros filed a putative class action complaint against Metropolitan and Moulton Niguel. The three complaints were consolidated. Collectively, we refer to defendants as the Water Districts.

All three complaints asserted causes of action for public and private nuisance, and inverse condemnation, seeking damages, injunctive relief, attorney fees, and costs. Each complaint alleges that chloramine in the water caused pinhole leaks in the copper piping of plaintiffs' homes.

The parties stipulated to sever five threshold legal issues for trial on the merits, four of which are at issue here. Those issues were:

"a. Are the Plaintiffs' causes of action preempted by federal Safe Drinking Water Act?

"b. Are the Plaintiffs' causes of action preempted by the California Safe Drinking Water Act; and/or application of *Hartwell Corp. v. Superior Court* [(2002) 27 Cal.4th 256], and *In re Groundwater Cases* [(2007) 154 Cal.App.4th 659]?

"c. As a matter of law, can the occurrence of pinhole leaks in residential copper plumbing give rise to inverse condemnation liability allegedly caused by the treatment and delivery of drinking water?

[¶] . . . [¶]

"e. As a matter of law, does the Defendants' compliance with statutory and regulatory mandates bar plaintiffs' public and/or private nuisance claims?"

Causation and damages were not at issue in this phase of the trial.

The court held a bench trial based on briefing and exhibits (no witnesses were called, though declarations were submitted). The court made findings on each issue in favor of the water districts, and entered judgment accordingly. Plaintiffs appealed.[1]

---

[1] In addition to the plaintiff homeowners, two homeowners associations and one residential home builder filed complaints. They are not parties to this appeal.

FACTS

Because, at this stage, the facts are largely undisputed, we quote extensively from the court's statement of decision.

"Defendant Metropolitan is a wholesaler of water to 26 member agencies, serving nearly 19 million people living in Southern California. [Citation.] Metropolitan imports water from two principal sources: (1) the State Water Project in Northern California, via the California Aqueduct, and (2) the Colorado River, via the Colorado River Aqueduct. [Citation.] These sources have distinct water quality profiles, each containing different organic constituents. Under conventional treatment and chlorination, these organic constituents generate a wide range of 'disinfection byproducts,' many of which pose a potential health risk. [Citation.] To combat these risks, Metropolitan treats imported raw water with chloramines, a secondary disinfectant, to reduce disinfection byproducts with the object of protecting human health. [Citation.] The California Department of Health Services ('DHS') first approved Metropolitan's use of chloramines as a secondary disinfectant in 1983. [Citations.] In April 1986, DHS issued Water Permit No. 86-016 to Metropolitan which acknowledged that Metropolitan obtained DHS' approval in 1983 to use chloramines. [Citation.] Metropolitan has consistently used chloramines since 1985."

"Congress enacted the Safe Drinking Water Act (federal SDWA) [citation] in 1974 to establish uniform quality standards for the public water systems in the United States and to reduce contamination in drinking water." (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 703; see 42 U.S.C. § 300f et seq.) "Under the authority of the [federal] SDWA, the United States Environmental Protection Agency ('EPA') protects public health by ensuring safe drinking water and overseeing the implementation of the federal SDWA." (See 42 U.S.C. § 300f (7); 40 C.F.R. § 141.) "The federal SDWA authorizes the EPA to develop and set national standards for

drinking water." (See 42 U.S.C. § 300g-1(b).) "To develop these standards, the EPA engages in a detailed risk and cost assessment and extensive review of the best available peer-reviewed science. The SDWA also charges the EPA with the responsibility of overseeing the states, localities, and water suppliers who implement the national drinking water program." "The [federal] SDWA gives states primary enforcement authority for drinking water programs provided that the states meet certain criteria, including the adoption of drinking water standards that are no less stringent than the national primary drinking water regulations promulgated by the EPA." (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 677-678.)

"The federal SDWA required the EPA to promulgate a Stage I Disinfectants and Disinfection Byproducts Rule ('D/DBP Rule') and a Stage II D/DBP Rule by using '(i) the best available, peer-reviewed science and supporting studies conducted in accordance with sound and objective scientific practices; and (ii) data collected by accepted methods or best available methods . . . .' [Citations.] The development of the D/DBP Rule began in 1992 when the EPA instituted a formal regulation negotiation process which included representatives from water utilities, state and local agencies, environmental groups, consumer groups and the EPA. [Citation.] The Stage I D/DBP Rule, promulgated on December 16, 1998, resulted after months of discussion and technical analysis with representatives of state and local health and regulatory agencies, public water systems, elected officials, and consumer and environmental groups. [Citation.] The Stage I D/DBP Rule set a Maximum Residual Disinfectant Level Goal ('MRDLG') and MRDL of 4.0 milligrams per liter (mg/L) for chloramine."

"The Stage II D/DBP Rule was promulgated on January 4, 2006 to provide for increased protection against the potential risks for cancer, reproductive and developmental health effects associated with disinfection byproducts. [Citation.] The Stage II D/DBP Rule did not alter the MRDLG and MRDL for chloramine."

"In 1991, the EPA promulgated the National Primary Drinking Water Regulations for Lead and Copper, 40 C.F.R. Par 141 ('Lead and Copper Rule' or 'LCR'). [Citations.] The purpose of these regulations is to protect public health by minimizing lead and copper levels in drinking water, primarily by reducing water corrosivity. 40 C.F.R. §§ 141.80 and 141.81(b) [Citations.] Lead and copper enter drinking water primarily through corrosion of service and plumbing lines and plumbing materials. [Citations.] To determine the corrosivity of drinking water, the Lead and Copper Rule requires routine monitoring at kitchen or bathroom taps of residences and other buildings based on so-called 'action levels' [(AL)] established by the EPA. The AL for copper is 1.30 mg/L based on the 90th percentile level of tap water samples taken from consumer faucets. 40 C.F.R. 141.80. Accordingly, no more than 10 percent of the samples can be above the AL. [Citation.] If the 90th percentile copper concentration is below the AL of 1.30 mg/L, then the water is non-corrosive to copper piping. If the 90th percentile copper concentration is above the AL of 1.30 mg/L, the water is corrosive to copper, and the AL is triggered. [Citation.] An AL exceedance is not a violation of the [Lead and Copper Rule], but rather, may trigger other requirements that include water quality parameter monitoring, corrosion control treatment, source water monitoring/treatment, public education, and lead service line replacement. 40 C.F.R. §§ 141.80-141.91 [citation]. Thus, the numeric AL established by the Lead and Copper Rule is the legal standard under the SDWAs for determining corrosivity of drinking water."

"The state SDWA [Health & Saf. Code, § 116270 et seq.] establishes a comprehensive regulatory scheme for public water systems in California. Under the state SDWA, the State of California assumed primary authority in 1976 to implement the federal drinking water regulations enacted by Congress and to set stricter water quality standards than those in the federal law. [Citations.] Acting on behalf of the State, the [State Water Resources Control Board (State Board)] now administers and maintains primary authority over the implementation of these standards. *See* Cal. Health & Safety

6

Code § 116271." (Fn. omitted.) "In regulating numeric limits of secondary disinfectants such as chloramines, California adopted the federal MRDL of 4.0 mg/L. Cal. Code Regs. tit 22, § 64533.5. Similarly, to reduce water corrosivity, California adopted the Lead and Copper Rule in 1995 and established a protocol for monitoring lead and copper levels in public water systems that mirrors that established by the EPA. Cal. Code Regs. tit. 22, § 64670, et seq."

"The water supplied by the [Water] Districts complied with all federal and California drinking standards at all relevant times. [Citations.] The water supplied by the [Water] Districts also complied at all relevant times with the applicable state and federal test for determining corrosivity of drinking water [i.e. the Lead and Copper Rule]. *See* 42 U.S.C. § 300g-1(b)(3)(A); Cal. Health & Safety Code §§ 116270(d), 116370 [citations]. At no point has any Responsible Agency ever cited the Districts for any Safe Drinking Water Act ('SDWA') violation, including the Lead and Copper Rule, the Action Level ('AL') for copper, and the Maximum Residual Disinfectant Level ('MRDL') for chloramines. [Citations.] Nor has any Responsible Agency ever convened or ordered the Districts to participate in any administrative hearing to consider any alleged SDWA violation by the Districts. [Citations.] No Responsible Agency has ever issued the Districts a cessation order. [Citations.] Metropolitan's water permit has been in good standing at all times since 1984 when it converted to chloramines as a secondary disinfectant."[2] (Fn. omitted.)

Prior to 1984, Metropolitan utilized another of the three secondary disinfectants authorized by the United States Environmental Protection Agency, free chlorine. The third authorized disinfectant is chlorine dioxide, but it sees little use

---

[2] The California Department of Health Services was succeeded by the Department of Public Health in 2007. (Health & Saf. Code, § 131051, subd. (a)(5).) Subsequently, in 2014, California's safe drinking water program was transferred to the State Water Resources Control Board. (Health & Saf. Code, § 116271, subd. (a)(4).) The parties use the general term "Responsible Agency" to refer to any of the three.

because it is too short lived and creates undesirable byproducts. Before switching to chloramine, Metropolitan extensively studied the comparative advantages and disadvantages of chloramine versus free chlorine. Metropolitan determined that chloramine was a superior choice because it creates fewer disinfectant byproducts, is more effective in controlling biofilms, is more stable and long lasting, and is less malodorous. Since the 1970's, one third of all major American utilities, and over half of California's major water utilities, have converted to chloramines as a secondary disinfectant.

DISCUSSION

*The Water Districts are Immune from Nuisance Liability*

Plaintiffs contend the Water Districts are liable for damage to their copper pipes on the theory of nuisance. The court was tasked with answering the question: "As a matter of law, does the Defendants' compliance with statutory and regulatory mandates bar plaintiffs' public and/or private nuisance claims?"

The court was also asked to make rulings on whether the federal or state Safe Drinking Water Act, or some combination of the two, preempt the plaintiffs' nuisance claim.[3] The parties raise interesting and difficult issues in that regard, but we find it unnecessary to reach them because we conclude plaintiffs' nuisance claim plainly

---

[3] Although the court found that both the nuisance claim and the inverse condemnation claim were preempted, inverse condemnation is a constitutional right of action that cannot be preempted by a legislative act. (See U.S. Const., 5th & 14th Amends.; Cal. Const., Art. I, § 19; *Loma Portal Civic Club v. American Airlines, Inc.* (1964) 61 Cal.2d 582, 594 ["state courts have jurisdiction to award compensation for a 'taking' without regard to whether the [challenged activity] conform[s] to federal law"]; *Aaron v. City of Los Angeles* (1974) 40 Cal.App.3d 471, 487 [federal regulation of airspace "does not immunize the owner and operator of an airport for failure to appropriate the land and air space necessary to provide" the public improvement].)

fails under Civil Code section 3482, which states: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."

Although Civil Code section 3482 speaks in terms of "a statute," that term has been broadly interpreted to include regulations and other express government approvals. Thus, for example, in *Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 888, the court held government defendants were immune from nuisance liability for discharging wastewater because the Water Quality Board had issued a permit allowing the discharge. In *Katcher v. Home S&L Assn.* (1966) 245 Cal.App.2d 425, 429-430, the court held that grading of land could not constitute a nuisance where the building was permitted and it complied with local municipal codes. Similarly, in finding immunity under Civil Code section 3482 through compliance with a city ordinance, one court noted, "[The ordinance], having been duly enacted by the city of Los Angeles within the scope of the authority conferred upon it, has the same force within its corporate limits as a statute passed by the Legislature has throughout the state." (*Wheeler v. Gregg* (1949) 90 Cal.App.2d 348, 370.) And in *Farmers Ins. Exchange v. State of California* (1985) 175 Cal.App.3d 494 (*Farmers*), the court applied Civil Code section 3482 to property damage caused by aerial pesticides because their use had been authorized by a combination of statutes and regulations. (*Farmers*, at pp. 500, 503.)

Civil Code section 3482 applies here for two reasons. First, as noted in the statement of facts above, the Water Districts had a permit from the California Department of Health Services expressly allowing chloramines in the water. Second, regulations issued pursuant to statutory authority expressly authorized the use of chloramines in the amount the Water Districts used.

Plaintiffs argue Civil Code section 3482 does not apply because it has been narrowly circumscribed to situations where the precise act is authorized by statute. Thus, in *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285 (*Varjabedian*) the court found Civil Code section 3482 did not immunize liability for an alleged nuisance from odors

9

emanating from a sewage treatment plant. "'"A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury."'" (*Varjabedian*, at p. 291.) There, while the construction of a sewage treatment plant was authorized, allowing the stink to escape was not. (*Id.* at p. 292.)

Similarly, in *Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123 (*Wilson*), the court rejected an electric utility company's invocation of Civil Code section 3482 where stray voltage from an electrical substation was entering the plaintiffs' home and shocking her. (*Id.* at p. 129.) The electrical substation was authorized. Allowing the stray voltage to exist was not. Thus, nuisance liability arising from the stray voltage was not immunized by Civil Code section 3482. (*Wilson*, at p. 158.)

Plaintiffs rely on *Varjabedian* and *Wilson* to argue the nuisance here was not authorized because there was no authorization to destroy copper pipes. But that precise argument was considered and rejected in *Farmers*, *supra*, 175 Cal.App.3d 494, where the court held Civil Code section 3482 immunized the aerial spraying of pesticide that caused widespread damage to automobile paint: "Plaintiffs' argument here is that the governor's proclamation pursuant to the Emergency Services Act did not 'expressly authorize' the state to damage automobile paint finishes. This misses the point. The authorizing statute need not predict the precise nature of the damages. It need only authorize the governmental action." (*Farmers*, at p. 503.) We agree.

In considering the foregoing cases, it is helpful to distinguish the act or condition constituting the nuisance from the consequences of the act or condition, such as being "injurious to health," or "indecent or offensive to the senses," or constituting an

10

"obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property" (Civ. Code, § 3479). Civil Code section 3482 immunizes liability for the *acts* that are "done or maintained" pursuant to the express terms of a statute. Thus, in *Varjabedian* the act that was "done or maintained" was allowing the odors to escape. That act was not authorized by statute, so Civil Code section 3482 did not immunize nuisance liability. In *Wilson*, the act that was "done or maintained" was allowing the stray voltage to exist. That act was likewise not authorized by statute, so Civil Code section 3482 did not immunize nuisance liability. But in *Farmers*, the act that was "done or maintained" was the spraying of the pesticide. That act was expressly authorized by statute, so Civil Code section 3482 immunized nuisance liability for that conduct.

Here, the act at issue is the inclusion of chloramines in the water. That precise act was plainly authorized. Accordingly, Civil Code section 3482 bars plaintiffs' nuisance claim, which was properly dismissed.

*The Water Districts are not Liable for Inverse Condemnation*

Plaintiffs also contend the Water Districts are liable for damage to their copper water pipes on the theory of inverse condemnation. The court was tasked with answering the question: "As a matter of law, can the occurrence of pinhole leaks in residential copper plumbing give rise to inverse condemnation liability allegedly caused by the treatment and delivery of drinking water?" The question posed assumes, for purposes of the legal analysis only, that the water supplied by the Water Districts does in fact cause the pinhole leaks in the copper pipes. Plaintiffs' inverse condemnation claim amounts to an assertion that they have suffered damage to their water pipes as an incidental consequence of government action in furtherance of a public purpose, namely, the furnishing of drinking water made safe for public consumption by its treatment with chloramines.

11

"'The most historically settled application of the Just Compensation Clause [of the Fifth Amendment to the United States Constitution]—indeed perhaps the *only* historically settled application—is the requirement that government must pay for property it *seizes* through an exercise of eminent domain.'" (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 378 (*Customer*), second italics added; U.S. Const., 5th Amend. ["nor shall private property be *taken* for public use, without just compensation" (italics added)].)  We, however, will analyze plaintiffs' inverse condemnation claim under the broader language of the California Constitution, article I, section 19 (section 19), subdivision (a), which provides that "[p]rivate property may be taken or *damaged* for a public use . . . only when just compensation . . . has first been paid to, or into court for, the owner." (Italics added.)

Plaintiffs' invocation of section 19 is unusual—perhaps rivalling the creative inverse condemnation claim made in *Customer*, *supra,* 10 Cal.4th 368.  In *Customer*, a criminal suspect took refuge in a retail store.  "In the course of apprehending the suspect, the police fired tear gas into the store, causing extensive property damage." (*Id*. at p. 371.)  The owner of the store brought "an action for inverse condemnation against the public entities that employed the law enforcement officers, on the theory that the damage caused by the officers constituted a taking or damaging of private property for public use within the meaning of the 'just compensation' clause of the California Constitution." (*Ibid*.)  Our Supreme Court held that "under the circumstances presented . . . the public entities involved may be held liable, if at all, only in a tort action filed pursuant to the Tort Claims Act." (*Ibid*.)

In reaching its conclusion in *Customer*, our high court reviewed the history and application of section 19, preliminarily noting that section 19 had "never . . . been applied to require a public entity to compensate a property owner for property damage resulting from the efforts of law enforcement officers to enforce the criminal laws." (*Customer*, *supra*, 10 Cal.4th at pp. 377-378.)  So too here, section 19 has never been

12

applied to require a public entity to compensate a property owner for alleged property damage resulting from the treatment and delivery of drinking water that is fully compliant with all state and federal clean drinking water standards.

The *Customer* court summarized the historical purpose of section 19 as follows:  "As is demonstrated by both the history and the consistent judicial interpretation of section 19, that provision never was intended, and never has been interpreted, to impose a constitutional obligation upon the government to pay 'just compensation' whenever a governmental employee commits an act that causes loss of private property. Instead, as we shall see, the addition of the 'or damaged' language in the California 'just compensation' provision simply was designed to expand the circumstances in which a private property owner may recover when the state takes property for a public use, or when the state's construction of a public work causes damage to adjacent or nearby property owners.  Neither the 'taken' nor the 'or damaged' language ever has been extended to apply outside the realm of eminent domain or public works to impose a Constitution-based liability, *unamenable to legislative regulation*, for property damage incidentally caused by the actions of public employees in the pursuit of their public duties.  On the contrary, such property damage, like any personal injury caused by the same type of public employee activity, has—throughout the entire history of section 19— been recoverable, if at all, under general tort principles, principles that always have been understood to be subject to the control and regulation of the Legislature." (*Customer*, *supra*, 10 Cal.4th at p. 378.)

"The California Constitution of 1879 added the phrase 'or damaged' to the just compensation provision [citation] but this change was not intended to expand the scope of the constitutional compensation provision beyond the ambit of eminent domain and public improvements.  It appears, instead, that the words 'or damaged' were added to clarify that the government was obligated to pay just compensation for property damaged in connection with the construction of public improvements, even if the government had

13

not physically invaded the damaged property." (*Customer*, *supra*, 10 Cal.4th at p. 379.) "It seems apparent that the addition of the words 'or damaged' to the 1879 Constitution was intended to clarify that application of the just compensation provision is not limited to physical invasions of property taken for 'public use' in eminent domain, but also encompasses *special and direct damage* to adjacent property resulting from the construction of public improvements. There is nothing that indicates the provision was intended to expand compensation outside the traditional realm of eminent domain." (*Id.* at pp. 379-380, italics added.)

Allowing compensation here for the damage alleged to have been done to plaintiffs' copper pipes would "expand compensation outside the traditional realm of eminent domain" (*Customer*, *supra*, 10 Cal.4th at p. 380) for at least two reasons.

First, as the plaintiffs freely acknowledge, "It is well settled that the fundamental policy underlying inverse condemnation . . . is that the cost of damage to a private property owner resulting from a public use that benefits the community 'should be spread among those benefited rather than allocated to a single member of the community.' [Citation.] Stated differently, 'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.'" We agree with plaintiffs' premise, but it does not help them.

Indeed, it has long been recognized that the purpose of section 19, as well as the purpose of the takings clause of the Fifth Amendment to the United States Constitution, is to ensure that individual property owners are not compelled to bear burdens or incur costs that, in fairness and justice, should be borne by the public at large. (*Richards v. Washington Terminal Co*. (1914) 233 U.S. 546, 557 [liability in inverse condemnation allowed where gases and smoke blown out of railroad tunnel imposed a "direct and peculiar and substantial . . . burden upon plaintiff's property without compensation to him"]; *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 262

14

["the purpose of the takings clause . . . is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole'"]; *Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492, 507 [to recover on regulatory taking claim, "[t]he landowner's property must be singled out for unique treatment in contrast to other landowners who could be affected by the proposed public work"].)

From this fundamental premise, however, plaintiffs draw what seems to us a remarkable conclusion—that they have, in fact, been "singled-out" to bear a burden that should be borne by the public as a whole. We see it very differently. The water purchased by plaintiffs and delivered to them by the Water Districts was treated in the same manner for *all* of the Water Districts' customers—plaintiffs were not "singled-out" to receive water treated differently from the water delivered to all of the Water Districts' customers. The court found that defendant Metropolitan "is a wholesaler of water to 26 member agencies, serving nearly 19 million people living in Southern California." Defendants Irvine Ranch and Moulton Niguel both receive treated water from Metropolitan. Irvine Ranch serves more than 330,000 residents, and Moulton Niguel serves more than 165,000 people. Thus, far from being "singled-out," plaintiffs are simply among the millions of people living in Southern California receiving the same treated water. Essentially, except for the few who may have private wells, and perhaps a few not plumbed with copper pipes, the entire water consuming public of Southern California is "burdened" by the same treatment, delivery and receipt of water as are plaintiffs. To the extent there is any burden or cost of repair arising out of that water delivery, it is already a burden being shouldered by the public. Plaintiffs have not shown their burden is unique, or that their homes, plumbed with copper pipes, are just a handful of homes out of millions served with the same water. The fundamental premise of section 19, that individuals should not bear the burden or a cost that in fairness should be borne by the public, is absent.

15

Second, compensation for the damage alleged here would also "expand compensation outside the traditional realm of eminent domain" because the plaintiffs invited the water into their plumbing systems—the delivery was consensual. Unsurprisingly, water damage has been a frequent subject of published appellate opinions on inverse condemnation. Plaintiffs cite several cases on the subject. However, all of the cases finding inverse condemnation liability share one common trait: they involve *uninvited* water onto the plaintiff's property, usually in the form of flooding. (See, e.g., *Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 598 [corroded pipe servicing fire hydrant burst and flooded the plaintiff's facility]; *McMahan's of Santa Monica v. City of Santa Monica* (1983) 146 Cal.App.3d 683, 687 [city-owned water main burst and flooded the plaintiff's building and personal property]; *Yee v. City of Sausalito* (1983) 141 Cal.App.3d 917, 919 [storm drain pipe system ruptured allowing water onto the plaintiff's property, causing soil subsidence]; *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591, 594 [storm drain pipe ruptured under plaintiff's home].)[4] Plaintiffs contend these cases are "conceptually indistinguishable from the delivery of water in pipes to private residences." But there is a crucial distinction: Plaintiffs voluntarily purchased the water from the Water Districts and brought the water into their private piping system.

Plaintiffs' theory of liability is akin to a traditional product liability theory. The treated water they purchased arguably suffered from a design defect, or perhaps liability could be asserted based on a failure to warn of the water's effect on copper pipes, or perhaps liability could be established under a simple negligence theory. As the *Customer* court explained, however, whether a tort theory of recovery on this or other

---

[4]     *McMahan's of Santa Monica v. City of Santa Monica*, *supra*, 146 Cal.App.3d. 683, *Yee v. City of Sausalito*, *supra*, 141 Cal.App.3d 917, and *Marin v. City of San Rafael*, *supra*, 111 Cal.App.3d 591 were disapproved in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432 on grounds not relevant here. We cite these cases only to distinguish them because Homeowners rely on them.

16

potential bases of liability should be allowed is a decision for the Legislature.  But the "taken" or "damaged" language of section 19 has never "been extended to apply outside the realm of eminent domain or public works to impose a Constitution-based liability." (*Customer*, *supra*, at p. 378.)  We decline to be the first court to allow such a free-ranging theory of tort liability under the guise of inverse condemnation.

DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs incurred on appeal.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.

17