28 So.2d 625

## WOODWARD IRON CO v. MUMPOWER.
### 6 Div. 436.

Supreme Court of Alabama.
Dec. 19, 1946.

Rehearing Denied Jan. 16, 1947.

[redacted]

[redacted]

Dryer & Dryer, of Birmingham, for appellant.

[redacted]

Ross, Ross & Ross, of Bessemer, for appellee.

[redacted]

504

GARDNER, Chief Justice.

Plaintiff, B. H. Mumpower, was the owner in fee simple of the surface rights of a tract of land consisting of a fraction over sixteen acres in Jefferson County, Alabama, upon which he conducted a dairy with about 80 cows. The defendant, Woodward Iron Company, owned the mineral rights to the property, and has mined coal thereunder, the general location being known as the "Mulga Mine."

Mumpower purchased this property in 1927 for the sum of $3282, and at a time when the land was without improvements. It had upon it a good spring from which there flowed through much of the property a branch, all of which lent itself to the dairy business, furnishing pasturage and water for the cows. Plaintiff immediately began construction of improvements consisting of a barn with concrete walls some 3 feet in height around the sides, and with a cement floor with drains and stalls for 40 cows, and troughs and walkways on the floor. He, also, constructed a milk house; a hay house; a five-room dwelling which was weatherboarded, ceiled and papered, with a composition roof and two porches; a four-room house, and another smaller house with three rooms. These improvements were many times painted, and the underpinnings and pillars were of brick. Plaintiff drilled a well on the property, referred to as well No. 1, 85 feet in depth, operated by an electric pump and, indeed, in all his improvements electricity was installed.

Plaintiff's testimony is to the effect that in September, 1941, his well, referred to as well No. 1, went dry over night, although previously it had furnished an ample supply of water; and that during the previous summer numerous breaks had appeared in the surface of his land. He, also, stated that he had heard blastings or explosions that appeared to be under or near his property sufficient to shake the glass in the buildings. His testimony is further to the effect that in December, 1943, the spring went dry, and that it now furnishes no water of any consequence. Within a month after well No. 1 went dry another well was drilled, with an electric pump installed therein; the well being drilled at a place designated by the agent for defendant, the cost therefor being paid by the defendant. Well No. 2 at first furnished an ample supply of water, but failed in December, 1943, when the spring and branch leading therefrom also went dry. The well would have water sufficient for dairy purposes only when there was a hard rain; and the plaintiff's evidence tends to show that the spring was only a mudhole after this time. There were times when there was some water in the well, and at other times it furnished no water at all. Well No. 2 was about 100

feet from the spring. There were cracks in the surface for three or four years which had been advancing toward the property of plaintiff. For one year prior to the filing of this suit on November 22, 1944, witness Earley saw cracks on plaintiff's land from one inch to one and one-half feet in width. The witness Hogan saw cracks twelve inches wide back of plaintiff's barn some time prior to Christmas, 1944, about 150 feet from this last drilled well. He, also, saw numerous breaks in the land. Witness Williams testified there were breaks in the land about 100 feet in length after well No. 2 failed; that there were breaks around the lower end of the barn, which was 25 feet from the well, after well No. 2 failed. These breaks were observed in 1943 and 1944. Some of the testimony indicated that there were surface breaks around the spring and, indeed, in numerous places over the sixteen acre tract. We may add that in 1942 defendant had its employees to fill in a number of breaks in the surface of plaintiff's land. There was evidence tending to show a break in the concrete barn after December, 1943, a slight sinking at the west end, with the break extending up the concrete wall from the ground. After this date the doors in the house occupied by the witness Williams sagged and would not open and close, and the windows worked only a part of the way up. Plaintiff testified that his barn floor caved and dropped, and that he built the ground up by filling in on several occasions; that the cement came loose at one corner of the milk house in December, 1943, and that he had to have the dwelling houses on his land straightened up, pillars put under them, that they "swagged," necessitating raising the floors.

After the failure of well No. 2 plaintiff applied to the land agent of the defendant to drill him a third well, but this request was declined. The nearest commercial water was some eight miles away, and plaintiff was forced to haul water to his dairy two or three days a week, 300 gallons at a time, from December 5, 1943, to July 1, 1945, the water supply of his well being about the same, if not worse.

The sanitary milk inspector for Jefferson County informed plaintiff that he would either have to obtain an adequate supply of water or discontinue the distribution of milk. Plaintiff's permit expired June 30, 1945, and its renewal was declined on account of the inadequacy of water. He quit the dairy business on July 1, 1945, having previously sold his land on August 16, 1944, for $4,500., and leased the property from the purchaser until he finally had to abandon the business July 1, 1945. The property is not now used for dairy purposes, though there is evidence tending to show well No. 2 furnishes water enough for the tenants of the dwellings on the place.

Plaintiff gives an itemized statement of the cost of the improvements, all of which tends to show that he had invested in the property fully $15,000. A disinterested real estate agent in that vicinity stated that in his judgment the property with adequate water supply was worth $15,000. There is ample proof to show that without adequate water supply the valuation was not in excess of $4,500. or $5,000.

The jury returned a verdict in favor of plaintiff in the sum of $10,000. and from the judgment following the defendant prosecuted this appeal.

Though the record is somewhat voluminous and there are 109 assignments of error, yet, reduced to the last analysis, there are in the brief for appellant few questions presented for consideration here.

The law of the case is well understood and needs no repetition. The principles were stated in Woodward Iron Co. v. Earley, 247 Ala. 556, 25 So.2d 267, and Republic Steel Corp. v. Stracner, 246 Ala. 620, 21 So.2d 690. The Earley case bears much resemblance as to the facts to the case here involved, plaintiff's property adjoining that of Earley, the road being the line. There is, however, one distinction. In the Earley case there was shown no damage to the land surface. Here, the jury could well infer such damage not only to the land surface, but to the buildings located on the property. There is ample proof to show damage to the barn and to the houses. For the mining operations under plaintiff's land resulting in damages of this character liability is absolute, regardless of the question of exercise of due care

by the miner. And, as to the loss of water from the wells and spring, we think it clear enough a jury question was presented as to whether or not there was negligence in the mining operations in such a manner as that it should have been anticipated plaintiff might suffer injury therefrom, and that the resulting damages were the proximate result thereof.

■ We have not only carefully read the proof in the record, but examined the maps offered by the defendant. Map marked Exhibit "C" gives a clear blueprint outline of plaintiff's property and of defendant's mining operations. Just under that part of the property of plaintiff where the wells, barns and spring were located the defendant in its mining had left what appears to be substantial pillars of coal. But to the west of this property, and 300 feet away, they had done what is called a "robbing operation," that is, gone back and taken the remaining coal which constituted pillars and support for the roof so as to get all the available coal. In this area quite a large amount of coal has been removed in this "robbing operation." Defendant's superintendant admits that in taking the pillars of coal, leaving nothing in their place, it is expected that the roof will cave in. The jury was held justified in concluding from the proof that the numerous cracks found in the surface of plaintiff's land emanated from this "robbed" area, and that though the proof may show that this was done as far back as 1940 or 1941, yet, it often takes time for such an operation to so cave in the surface as to gradually affect the adjoining property. And, as noted in the Earley case, supra, the owner of the surface often must of necessity rely upon circumstantial proof to establish the matter of want of due care in' the mining operations. We have not overlooked the testimony of the two experts— one, the State Geologist, the other, a graduate of the engineering course, who, likewise, had studied geology in the course of his engineering studies, to the effect that these breaks in the surface, which have been testified to by plaintiff's witnesses, had no effect on the water supply. Their testimony is, of course, to be given due con-

sideration. It must be added, however, no satisfactory explanation for the sudden loss of water on these premises appears from their evidence. This is not a matter as to which only experts could testify. The jury was competent from the other proof offered to reach their own conclusion as to the cause of this sudden loss of water.

Counsel for defendant lay much stress upon Sloss-Sheffield Steel & Iron Co. v. Wilkes, 236 Ala. 173, 181 So. 276. We have carefully reread the opinion in this case and find that there is nothing therein contained which militates against the conclusion that we have reached. The facts in that case are far removed from those here presented, and it bears no analogy.

Without extending this opinion to undue length we could not discuss in any degree of detail the evidence which we think justifies the submission of the issue of negligence for jury consideration. Of necessity, therefore, much evidence leading to this result must be omitted from discussion.

As we have previously observed, the testimony of the experts is to be given due consideration, yet, in the instant case this evidence is not conclusive on the jury, but is merely to be weighed by them in connection with all the other testimony presented. The following authorities sustain this view. Sovereign Camp, Woodmen of World v. Screws, 218 Ala. 599, 119 So. 644; Commonwealth Life Insurance Co. v. Harmon, 228 Ala. 377, 153 So. 755; Pollard v. Treadwell, 234 Ala. 615, 176 So. 452; Warrior Stone & Contracting Co. v. DeFoor, 241 Ala. 227, 2 So.2d 430.

■ There is some general suggestion in brief that the question of annoyance and inconvenience suffered by plaintiff due to the lack of water supply in the operation of the dairy was not a matter for the jury's consideration. We find, however, no specific assignment of error argued in brief touching the question. But we may observe, in a general way, that clearly the annoyance and inconvenience to plaintiff in having to haul water some 8 miles is properly to be considered by the jury in determining the depreciated value of the property. Howell v. City of Dothan, 234 Ala. 158, 174 So. 624; Louisville & N. R. Co.

v. Maddox, 236 Ala. 594, 183 So. 849, 118 A.L.R. 1318; Alabama Water Service Co. v. Wakefield, 231 Ala. 112, 163 So. 626.

■ This case was submitted to the jury under counts 1 and 3. In count 1 it was averred that defendant had carried on mining operations under plaintiff's land during 1943. It developed from the facts that the operations were conducted during the years 1935 and 1936, and that the "robbing" of pillars from the western edge of plaintiff's property was in 1940. Counsel for defendant, therefore, insists that due to this variance the affirmative charge requested as to count 1 should have been given, citing Central of Georgia R. Co. v. Simons, 150 Ala. 400, 43 So. 731, and Kennedy Brothers v. Mobile & Girard R., 74 Ala. 430. We are of the opinion, however, that Circuit Court Rule 34, Title 7, Code of 1940, page 1035, Code 1940, Tit. 7 Appendix, furnishes sufficient answer to this insistence. There was no objection whatever raised in the court below as to any question of proof concerning the date of the mining operations, nor, so far as we read the record, the slightest indication to the court that the question of variance was involved. This was a variance that could be readily cured by amendment, which amendment might well have followed the language of count 3, as to which there is no objection indicated. Had this matter been brought to the attention of the court or counsel for plaintiff during the trial the matter could have readily been cured by amendment as we have stated. The mere asking for the affirmative charge as to count 1, and its refusal, therefore, under Circuit Court Rule 34, is not error to reverse. Illustrative of the application of this rule in former decisions we may cite Bickley, etc. Co. v. Porter, 193 Ala. 607, 69 So. 565; Carter v. Sugarman, 197 Ala. 577, 73 So. 119; Sanders v. Gernert Bros. Lumber Co., 221 Ala. 469, 129 So. 46; Rasmus v. Schaffer, 230 Ala. 245, 160 So. 244; Central of Georgia R. Co. v. Hardman, 226 Ala. 515, 147 So. 670; Birmingham Ry. Light & Power Co. v. Glenn, 179 Ala. 263, 60 So. 111.

■ Defendant further insists that it is incumbent upon the plaintiff to show the damages suffered by him during the period from November 22, 1943, which was one year before filing the suit, and August 16, 1944, the date on which the plaintiff sold his property. Conceding the correctness of this position we think it clear enough the defendant suffered no prejudice in this respect. This for the reason the trial judge emphatically and clearly instructed the jury that plaintiff's damages to be recoverable must have been suffered between November 22, 1943 and August 16, 1944. The trial judge, in explanation of the charge (37) given for the defendant, gave the jury the following instruction:

"I will state to you gentlemen in this connection that in suits of this kind, and in this particular suit, or, rather, in suits of this kind recovery can be had for damages sustained only for and during the period of twelve months, that is, one year next before the filing of a suit. The law barring any recovery for damages or injury occurring and more than a year prior to the filing of the suit. And in this particular case the evidence is without dispute that the plaintiff sold the property on August 16, 1944, that he didn't own it after that period of time. So any damages occurring, if any, subsequent to, that is, after August 16, 1944, would not be recoverable in this action. That is, any recoverable elements of damages in this action would be limited to the period from November 22, 1943, up to the period of August 16, 1944, when he sold the property."

Charge 37 given for defendant is to like effect.

A careful reading of this record is fully persuasive that the jury was in no manner misled, and fully understood the limitations of the plaintiff's rights of recovery. Defendant, therefore, can take nothing by this point.

■ The question last considered relates to the insistence that the verdict was excessive. The evidence for the plaintiff tends strongly to show that his improved property was well adapted for the purposes for which it was bought, a dairy business, and for that purpose it had been destroyed. His testimony further tends to show that he had invested at least $15,000 in the property, and an unbiased real estate agent un-

hesitantly placed its value at $15,000 considering an ample supply of water, and that its present value was not exceeding $5,000.

Though defendant offered proof of a much lower valuation—not exceeding $4,500 or $5,000, under any conditions—yet, there was substantial proof which warranted a finding that in fact plaintiff had sustained a $10,000 loss. The case appears to have been tried with care and given attentive consideration by the learned trial judge who denied the motion for a new tria', among the grounds of said motion for a new trial being the excessiveness of the verdict rendered.

Upon a review of the case by the court in consultation we are persuaded the record does not justify this court in disturbing the action of the court below in refusing a new trial, nor do we feel the case is one calling for a reduction in the amount of the verdict.

We have considered the questions which appear to be argued in brief for defendant, and we find no error to reverse. Let the judgment, therefore, stand affirmed.

Affirmed.

FOSTER, LAWSON, and STAKELY, JJ., concur.