804 So.2d 220 (2001)
CITY OF MOBILE
v.
F. Martin LESTER and Frances Lester.
City of Mobile
v.
Juanita Patterson.
City of Mobile
v.
James C. Van Antwerp and Elizabeth Van Antwerp.
City of Mobile
v.
Stanley Thurston, Jr., and Ann Thurston.
2990672, 2990673, 2990677 and 2990678.
Court of Civil Appeals of Alabama.
June 1, 2001.
*221 Charles S. Willoughby of Peters, Redditt, Willoughby, Zoghby & Carbo, Mobile, for appellant.
*222 Steven L. Nicholas and Steve Olen of Olen, Nicholas & Copeland, P.C., Mobile, for appellees S. Martin Lester and Frances Lester.
YATES, Presiding Judge.
These four appeals, each with a cross-appeal, arise from claims brought by the plaintiffs, Martin Lester and Frances Lester, Juanita Patterson, James C. Van Antwerp and Elizabeth Van Antwerp, and Stanley Thurston, Jr., and Ann Thurston, against the City of Mobile, after their homes were damaged because of settling. The plaintiffs alleged that the settling damage was caused by repairs the defendant City of Mobile made to Dauphin Street.
Following a trial, the court submitted two verdict forms allowing the jury to award damages based on the plaintiffs' claims of negligence or, in the alternative, on their claims of inverse-condemnation. The jury rejected the plaintiffs' inverse-condemnation claims and rendered a verdict, based on negligence. It awarded the Lesters $150,000 in property damage and awarded Frances Lester $15,000 for mental anguish; it awarded Mrs. Patterson $142,000 for property damage and $15,000 for mental anguish; $150,000 to the Van Antwerps for property damage and $10,000 to Elizabeth Van Antwerp for mental anguish; and $165,000 to the Thurstons for property damage and $10,000 to Ann Thurston for mental anguish.
The plaintiffs filed a joint postjudgment motion seeking an amendment of the judgment based on their claims of inverse condemnation. The plaintiffs also sought costs and attorney fees, based on inverse condemnation, pursuant to § 18-1A-32, Ala.Code 1975. The trial court denied the motion. The City filed a postjudgment motion, renewing its motion for a judgment as a matter of law ("JML"), or, in the alternative, seeking a new trial. The court denied the motion. The City also filed a postjudgment motion seeking a remittitur of the plaintiffs' property-damage awards, based on § 11-93-2, Ala.Code 1975, which limits damages against a governmental entity to $100,000. The court granted the motion to limit each of the plaintiffs' property-damage awards to $100,000.
The City appealed, arguing that it was entitled to a JML or, in the alternative, that the trial court erred in allowing the plaintiffs to recover damages for mental anguish. The plaintiffs cross-appealed, arguing that the trial court had erred in submitting their claims of negligence and inverse condemnation as alternate theories. The plaintiffs also argued that the trial court erred in reducing the property-damage award, because, they contend, inverse condemnation was the proper claim. All parties appealed to the supreme court, which transferred the appeals to this court, pursuant to § 12-2-7(6), Ala.Code 1975.
The plaintiffs are neighbors, living on Claridge Road. The Thurstons, Mrs. Patterson, and the Van Antwerps all live on the north side of Claridge Road North, and the rear of their properties abuts Dauphin Street. The Lesters live on the south side of Claridge Road North, across from the Van Antwerps. In 1994, the pavement on Dauphin Street near McGregor Avenue began to sink, creating what someone described as a "roller-coaster" effect on the road.
Originally, the City believed that dirt seeping into an open joint on an abandoned sewer line underneath the road was causing the road to settle and creating the roller-coaster effect. After excavating the road, the construction company hired by the City to complete the repairs discovered an abandoned French drain under the roadbed. The French drain was 6 inches *223 in diameter, made of cement, and ran the length of the excavation area. The depth of the drain varied, with the east end of the French drain 6 to 8 feet below ground surface and the west end of the drain 22 feet below ground surface. The drain had open joints that had been connected with tar paper, and the joints had been surrounded by gravel. The tar paper had deteriorated. The material surrounding the French drain was clay sand excavated from the area when the drain was installed.
A new drain was installed; it was an 8-inch polyvinyl chloride ("PVC") perforated pipe. Rather than keeping the clay sand around the new pipe, the area around the new pipe was excavated and surrounded by gravel, in order to keep the clay sand from entering the pipe and to allow more water to drain from the soil into the pipe. The new drain was two feet higher on the west end than the old drain was, so that it could capture as much underground water as possible. The new drain was perforated in order to allow more water into the pipe. Following the repair, Dauphin Street stopped settling.
All of the plaintiffs testified as to damage to their homes caused by settling that had occurred since the repair to Dauphin Street in 1995. The plaintiffs filed claims with the City. The City hired Geotechnical Engineering and Testing to evaluate the plaintiffs' claim that the repair to Dauphin Street had caused damage to their property. Hank Oakes testified on behalf of Geotechnical Engineering. Oakes is an engineer and specializes in geotechnical engineering, which is commonly referred to as "soils engineering." Oakes confirmed that the plaintiffs had recently had significant damage to their homes due to significant settling, including misaligned doors, separation of cabinets from ceilings, and cracking and differential settlement of exterior brick siding and patios. Oakes concluded that the damage was caused by a lowering of the groundwater, but he testified that he could not determine what caused the lowering of the groundwater. He opined that ordinarily all four of the houses would not start to settle at or near the same time, especially 25 to 30 years after construction, without the introduction of an outside factor, and that a lowering of the groundwater had caused the damage. However, Oakes testified that he could not connect the Dauphin Street repair with the lowering of the groundwater around the plaintiffs' homes.
Robert Thomas Wood, a geologist with an expertise in hydrology, testified concerning the groundwater around the plaintiffs' homes. Hydrology concerns the properties, distribution, and circulation of water on the surface of the land and in the soil. Wood took soil samples from the plaintiffs' property and from Dauphin Street where the repair was done, took groundwater measurements, checked the annual rainfall information and seismic activity, and examined the historical nature of the development in and around the plaintiffs' homes. Wood also used various maps and photographs from the City and the United States Geological Survey in forming his opinion. The geological maps contained historical information on the hydrology of the area. The City maps were topographic maps showing the natural and man-made features in the area. The photographs were a series of aerial photographs of the area dating back to 1940. Wood concluded that the area where the City had placed the new drain was the area that had replenished the groundwater under the plaintiffs' homes.
Wood further testified regarding the effect the new pipe had on the groundwater underneath the plaintiffs' homes. He testified that the perforations in the new 8-inch *224 PVC pipe had caused more water to be drained from the soil. He testified that the 8-inch pipe had twice the area of the older 6-inch pipe, which meant that the pipe could hold and drain more water. Wood also testified that the biggest difference in the amount of water drained from the soil by the old pipe as compared to the amount drained off from the new pipe was that the City placed a very porous material around the new pipe and that material allowed more water to be drained from the soil. In contrast, the old pipe was backfilled with a clay sand that had been excavated from the area, which was a very poor conductor of water and allowed very little water to be drained from the soil. Wood referred to the new drain as a "super drain" in comparison with the old drain, based on the conductivity of the porous material surrounding the new drain.
Dr. Joseph Olsen, a professor and chairman of the Civil Engineering Department at the University of South Alabama, examined the plaintiffs' homes. Olsen testified that, based on the damage he had observed and on his knowledge of soil mechanics, he thought the plaintiffs' homes settled as a result of a lowering of the groundwater beneath their homes. He testified, based on the depositions from those persons involved in the repair work to Dauphin Street, that while the repair stabilized Dauphin Street, it also intercepted groundwater that, had it been left the way it was, would have replenished the groundwater underneath the plaintiffs' homes. He further opined that the settlement of the homes was not due to decomposition of organic matter underneath the homes.
Dr. James Laier, an engineer specializing in soils engineering, testified for the City. He stated that he used information gathered by Hank Oakes to make his conclusions. Dr. Laier testified that soil samples taken over a two-month period after the repair work had been done, indicated a seasonal variation in the groundwater level. He stated that the new drain would not have affected the groundwater and that the plaintiffs' homes were too far from Dauphin Street to have been affected. Dr. Laier stated that if the construction work had affected the groundwater, it would have affected the water level of a lake, which was closer to the construction project than the plaintiffs' homes were.
On cross-examination, Dr. Laier admitted that when originally deposed, he had said he believed that organic soil decomposition had caused the damage to the plaintiffs' homes. However, he admitted that he later changed his opinion and concluded that organic decomposition was not the cause, because the amount and type of peat under the four homes varied. Dr. Laier testified that of the 20 data points he plotted on the map to make his determination of the groundwater flow, 10 of them were misplotted. Dr. Laier also stated that he believed roots from trees and vibrations from a large truck could have contributed to the damage to the plaintiffs' homes, although he testified that he had never been inside the plaintiffs' homes to see the actual damage.
The City argues that it was entitled to a JML, because, it says, the plaintiffs failed to present substantial evidence indicating that the City's repair work to Dauphin Street lowered the groundwater at the plaintiffs' homes. Specifically, the City argues that because there was no evidence of the exact groundwater level at the plaintiffs' homes before the repair work was done to Dauphin Street, the plaintiffs could not prove the groundwater around their homes had been lowered.
*225 In Fleetwood Enterprises, Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala.2000), the supreme court stated:
"`The standard of review applicable to a directed verdict or to a denial of a motion for a directed verdict is whether the nonmoving party has presented substantial evidence in support of his position.' K.S. v. Carr, 618 So.2d 707, 713 (Ala. 1993). `Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). We have held:
"`Upon review of a motion for a directed verdict or a JNOV, evidence must be viewed in the light most favorable to the nonmoving party, and if reasonable inferences in favor of the plaintiff's claim can be drawn from the evidence, the motion must be denied. Zaharavich v. Clingerman, 529 So.2d 978, 980 (Ala.1988).' Woodruff v. Johnson, 560 So.2d 1040, 1041 (Ala. 1990)."
The City's argument, that in order to create an issue of fact for the jury's consideration regarding causation the plaintiffs had to submit detailed readings of the groundwater taken before the repair work to Dauphin Street, is without merit. Viewing the evidence in a light most favorable to the plaintiffs and entertaining all reasonable inferences the jury would have been free to draw, we hold that the plaintiffs presented substantial evidence of causation.
The City's investigating engineer, Hank Oakes, testified that the damage to the plaintiffs' homes was due to diminished groundwater. Wood, a geologist with an expertise in hydrology, testified that he reviewed the historical geologic information from that area collected by the United States Geological Survey, along with topographic maps of the city and aerial photographs that showed the residential development of the area over the years. He also took soil borings to test the current groundwater level around the plaintiffs' homes. Wood testified to the purpose of the new drain under Dauphin Street and its effect on the plaintiffs' homes. He performed extensive studies of the groundwater flow to support his conclusion that the groundwater underneath the plaintiffs' homes came from the area of the recent construction and that the new pipe altered the groundwater level, causing damage to the plaintiffs' homes.
The plaintiffs presented evidence refuting other theories of causation. Wood studied the history of the rainfall in the area to see if a severe drought might have caused the groundwater to lower, and he concluded there was nothing unusual about the rainfall that preceded all four plaintiffs' sudden problems with their homes. He also studied earthquake information to determine if there was another adequate explanation for the rapid settlement of all four homes and opined that there was none.
"As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of *226 other plausible theories with or without support in the evidence."
Southern Ry. v. Dickson, 211 Ala. 481, 486, 100 So. 665, 669 (1924).
In Alabama Power Co. v. Cummings, 466 So.2d 99 (Ala.1985), the supreme court recognized that landowners must often rely on circumstantial evidence to establish the cause of subsidence. In Cummings, the plaintiff's home began to settle; she alleged that Alabama Power Company was responsible for the damage, which she alleged had been caused by the collapse of one of Alabama Power's subsurface mines. The jury found in favor of the plaintiff; Alabama Power appealed, arguing that the verdict was based on mere conjecture. We note that in Cummings the plaintiff's expert was a geologist, who testified as to the cause of the settlement. The supreme court affirmed the judgment based on the verdict, stating:
"On cross-examination, Jordan [the plaintiffs expert] conceded that his opinion was based solely on his observations of the surface and that, not having seen the collapse, he could not state, as a matter of fact, that the mine had collapsed. Alabama Power argued that since a jury's verdict cannot be based on speculation or conjecture, the jury could not find that the mine had collapsed and had caused the damage.
"We disagree. Jordan's opinion as to the cause of the land subsidence constituted competent evidence as to the cause of the injury. Landowners often must rely on circumstantial evidence to establish that the collapse of an underground mine caused the damage to their property. Woodward Iron Co. v. Mumpower, 248 Ala. 502, 506, 28 So.2d 625, 627 (1947); Woodward Iron Co. v. Earley, 247 Ala. 556, 558, 25 So.2d 267, 268 (1946). An Alabama Power Company mine safety engineer testified that he had no knowledge of the condition of the mine because it was inaccessible. Jordan enumerated the likely causes of land subsidence of the type which occurred on [the plaintiffs] land and explained why he had eliminated each of the probable causes other than mine collapse from his consideration in reaching his conclusion. A properly predicated opinion by a duly qualified expert constitutes evidence from which a finding can be made. Crawford Coal Co. v. Stephens, 382 So.2d 536, 539 (Ala.1980)."
Cummings, 466 So.2d at 101 (citations omitted).
The City argues that the plaintiffs failed to prove causation and that the failure of proof is underscored by several points. However, each of these points was refuted by evidence presented at trial.
First, the City contends that the plaintiffs' homes were constructed on an area that contained organic soil, soil that was incapable of supporting a home, because of decomposition.[1] However, Wood testified *227 that the peat in the soil underneath the plaintiffs' homes had decayed millions of years ago and was not now susceptible to decay. Dr. Olsen testified that the theory that natural decomposition of organic matter caused the damage of the plaintiffs' homes was not "even worthy of consideration," because, he said, the peat underneath the plaintiffs' homes had already decayed as much as it was going to without oxygen and that even seasonal variation in the water level over hundreds of years would not affect the decay rate of the soil. Oakes testified that in his opinion the rapid rate of settlement in the plaintiffs' homes excluded organic soil decomposition as a possibility. Dr. Laier also testified that decomposition of organic soil was not the cause of the damage.
Second, the City contends that several years before the work was done on Dauphin Street, Mrs. Patterson's foundation had been repaired.[2] In 1988, Mrs. Patterson had one corner of her home under-pinned because her neighbor, who was an engineer, suggested that it would be a good idea. She testified that she had not seen any structural damage to her home, inside or outside, when the underpinning was done and that the underpinning was done to enhance the home's resale value. Oakes testified that the prior repair was not a factor in the recent damage.
Third, the City contends that groundwater fluctuates seasonally as a consequence of variations in rainfall, but that this fluctuation does not prove that the groundwater level was lower as a result of the repair work to Dauphin Street. Both Wood and Dr. Olsen testified that groundwater fluctuates seasonally. However, they both testified that over time seasonal variation in the groundwater level is essentially nil and that it was the change in the groundwater level upstream from the plaintiffs' homes, where the repair work was done on Dauphin Street, that caused the damage.
Fourth, the City contends that Mrs. Van Antwerp testified that the groundwater level at her home was two feet below the surface prior to the repair work to Dauphin Street and that "it was substantially unchanged from that which the scientific testing and measurement revealed the level to be subsequent to the construction work." She testified that she would "hit water" when she used a posthole digger to remove sod. She further stated that the maximum depth she could go before hitting water was 2 feet, based on her belief that a posthole-digger blade was about 12 inches long. The second portion of the City's contention cites testimony from Robert Wood's measurements near the four homes after the repair work, which indicated that the groundwater level averaged 3 ½ feet to 2 ½ feet. Rather than supporting the contention that the groundwater had not dropped, this evidence tends to show that it had dropped from where Mrs. Van Antwerp believed she had struck water at the two-foot level.
Fifth, the City contends that a lake near the repair work on Dauphin Street remained virtually unchanged after the work was completed. Hank Oakes, during his investigation for the City, asked if anyone living near the lake had noticed a change in the level and was told that they had not. However, Oakes also stated that he did not investigate whether there was another source of water for the lake. This is consistent with Wood's testimony. Wood testified that surface water was not the main source of water for the lake, but that an underground spring fed that lake; this meant that even though the Dauphin *228 Street repair lowered the groundwater, this lowering would not have affected the level of water in the lake.
Sixth, the City contends that the plaintiffs should have presented evidence of "general subsidence," i.e., in this case, damage to streets and curbs near their homes, in order to support their claim that the damage to their homes was due to a lowering of the groundwater. However, such evidence was not necessary for the plaintiffs to prove their case. The plaintiffs presented evidence indicating that the groundwater level near their homes had been lowered because of the repair work on Dauphin Street. With regard to their claims for damages, each of the plaintiffs presented evidence of damage to their homes. Although any evidence of damage to the streets and curbs near their homes may have lent additional support to their claim, it was not a necessary element of their claims. We note that it does not appear that the City questioned any of the experts with regard to this theory it now raises.
Seventh, the City contends that the groundwater level around the plaintiffs' homes could not have been any higher before the repair work to Dauphin Street than it was found to be after the repair work, based on the testimony of its expert, Dr. Laier, because if it had been then the streets would have been under water. However, it was shown on cross-examination that Dr. Laier had misplotted 10 points on his map regarding the flow of groundwater. The parties presented conflicting expert testimony, and the jury, as fact-finder, was entitled to reject Dr. Laier's findings.
The City next argues that the trial court erred in allowing Mrs. Patterson, Mrs. Lester, Mrs. Thurston, and Mrs. Van Antwerp to testify as to mental anguish they said had been caused by the City's repair work. The City argues that no physical injury was done to the four female plaintiffs and, furthermore, that the supreme court's adoption of the "zone-of-danger" test prevented the trial court from charging the jury that it could award damages for mental anguish.
The supreme court in AALAR, Ltd., Inc. v. Francis, 716 So.2d 1141 (Ala.1998), reiterated the principle that one can recover for emotional injury if he or she sustains a physical injury as a result of the defendant's negligent conduct. However, the court pointed out that, pursuant to Alabama's "zone-of-danger" rule, a plaintiff not suffering physical injury as a result of the defendant's negligent conduct can recover for emotional injury only if the plaintiff was "placed in immediate risk of physical harm by that conduct." Id. at 1147.
In Wal-Mart Stores, Inc. v. Bowers, 752 So.2d 1201 (Ala.1999), the plaintiffs argued that, even though they were not in the zone of danger, they should be able to recover mental-anguish damages for harm that resulted from a service performed on their automobile that caused damage, if the damage was done under insult or contumely. The supreme court held that the "insult or contumely" exception did not apply in mere negligence cases. Rather, the zone-of-danger test applies in negligence actions involving damage to property only.
In White Consolidated Industries, Inc. v. Wilkerson, 737 So.2d 447 (Ala.1999), the plaintiffs' home burned, along with all of their possessions, because of a defect in an air conditioning unit they had recently purchased and installed. They suffered property damage, but no physical injury. They sought mental-anguish damages based on a claim made under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). Even though the case *229 was not a traditional negligence case, the supreme court applied the zone-of-danger test and held that because the plaintiffs were not at home at the time of the fire, they had not been within the zone of danger.
In Ex parte Grand Manor, Inc., 778 So.2d 173 (Ala.2000), the supreme court discussed damages for mental anguish in a negligent-manufacture claim against a mobile-home manufacturer. In Grand Manor, the manufacturer argued that the plaintiffs could not recover for negligent manufacture of the mobile home, because the only "injury" alleged was damage to the mobile home. The supreme court agreed with the manufacturer that the plaintiffs had made no allegation, and had offered no evidence to prove, that they had suffered any injury to themselves or any damage to their property (other than the mobile home) and that the damage to the mobile home itself was insufficient to support their negligent-manufacture claim.
The Grand Manor court discussed the plaintiffs' mental-anguish damages with regard to the "zone-of-danger" test.
"`In negligence actions, Alabama follows the "zone-of-danger" test, which limits recovery of mental anguish damages to "those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct."' Wal-Mart Stores, Inc. v. Bowers, 752 So.2d 1201, 1203 (Ala.1999)(quoting AALAR, Ltd., Inc. v. Francis, 716 So.2d 1141, 1147 (Ala.1998), and citing White Consol. Indus., Inc. v. Wilkerson, 737 So.2d 447, 449 (Ala.1999).) The evidence, when viewed in a light most favorable to the [plaintiffs], does tend to show that they were potentially at risk of suffering physical injury as the result of [the manufacturer's] alleged negligent manufacture of the mobile home, specifically because of the problems with the water pressure and the interior electrical wiring. However, whether the [plaintiffs] were potentially at risk of physical injury is not dispositive of the question regarding their ability to recover mentalanguish damages. We must also determine whether the [plaintiffs] presented substantial evidence indicating that they, in fact, suffered mental anguish as a result of [the manufacturer's] alleged negligent conduct. As this Court stated in AALAR, in order for a plaintiff to recover for emotional distress, he must show not only that `it was reasonably foreseeable to [the defendant] that [the plaintiff] would be placed at risk of physical injury' but also that `he, in fact, suffered emotional distress.' 716 So.2d at 1147. Thus, we cannot simply assume that the [plaintiffs] suffered mental anguish."
Grand Manor, 778 So.2d 173 at 179.
The supreme court in Grand Manor went on to discuss the plaintiffs' evidence regarding mental anguish. The plaintiffs presented evidence indicating that their son was scalded as a result of the water-pressure problem, but their son was not a party to the lawsuit and no claim was made on his behalf. Although the Grand Manor plaintiffs presented evidence indicating they had felt anxiety for their children and had worried about their purchase of the mobile home, this was insufficient to support an award of mental-anguish damages.
In the present case, it appears that the only plaintiff who presented evidence of potentially being at risk of physical injury was Mrs. Patterson. She testified that her sewer pipes had separated, causing various plumbing problems; that the pipes to her gas water heater had separated, causing a leak; and that a rat had entered her home through a crack. *230 Following Grand Manor, we must now determine whether Mrs. Patterson presented evidence indicating that she, in fact, suffered mental anguish as a result of the City's negligent conduct. She testified that she was taking anti-depressants and sleeping pills because of her worry, anxiety, and lack of sleep she had experienced because of the problems in her home. Mrs. Patterson's mental distress over her home caused physical discomfort that required medication. That portion of the judgment awarding Mrs. Patterson mental-anguish damages is to be affirmed; however, Mrs. Lester, Mrs. Van Antwerp, and Mrs. Thurston's mental-anguish awards must be reversed.
The plaintiffs argue that the trial court erred in holding that their claims of negligence and inverse condemnation were mutually exclusive. The court submitted those claims to the jury as alternate theories and charged the jury that if it found for the plaintiff, it must choose between the two theories. The jury found the City to be negligent.
The plaintiffs argue that the same negligence the jury found, negligence on the part of the City in designing or constructing the repair work to Dauphin Street, also resulted in a "taking" of the plaintiffs' property by an inverse condemnation. We note that the plaintiffs are not arguing that their inverse-condemnation claim alone should have been submitted to the jury, but that the jury did not have to elect between that claim and the negligence claim. The plaintiffs further argue that the court's telling the jury it must choose between the two theories of recovery would have been harmless error but for the statutory cap of § 11-93-2, which applies to tort judgments, i.e., they contend that if the jury had found for the plaintiffs on the inverse-condemnation claim, then the $100,000 cap would not apply.
An "inverse-condemnation" claim is a claim against a governmental authority to recover the value of property taken by that governmental authority without exercising its power of eminent domain. Jefferson County v. Southern Natural Gas Co., 621 So.2d 1282 (Ala.1993). Article XII, § 235, of the Alabama Constitution makes cities liable for just compensation for damages "for the property taken, injured, or destroyed by the construction or enlargement of its works, highways, or improvements" when the cities have not initiated formal condemnation proceedings. Clearly, § 235 provides for "injury" to property, as well as for an actual taking of the property. The "injury" or damage to the property would be the difference between the fair market value of the property before the work was done and the fair market value of the property afterwards. City of Tuscaloosa v. Patterson, 534 So.2d 283 (Ala.1988).
In Mahan v. Holifield, 361 So.2d 1076 (Ala.1978), the supreme court addressed the relationship between a claim of negligence and a claim of inverse condemnation pursuant to § 235. In Mahan, the property owners sued the City of Tuscaloosa after a dam had broken in 1973; they alleged that the break had caused large amounts of silt and debris to be deposited on their land. The dam had been built before 1955, and it had been rebuilt by the City in 1961, following a flood. The court stated:
"[Section 235] has been interpreted to support a cause of action by a private landowner whose property is taken or damaged by a municipality as a consequence of its acts of construction or enlargement. In such actions, the property owner may waive the tort and sue in assumpsit for compensation. Hunter v. City of Mobile, 244 Ala. 318, 13 So.2d 656 (1943).
*231 "The issue, then, in light of Hunter, is whether the plaintiffs' property was `either taken or damaged for public purposes.' This Court has long recognized that:
"`The right of recovery of compensation by the property owner, under the provisions of section 235 of the Constitution, is confined, of course, to where the municipality is engaged in the construction or enlargement of the works, highways, or improvements of the city.' City of Birmingham v. Graves, 200 Ala. 463, 76 So. 395 (1917).
"The taking which is the basis of the alleged implied contract in this case is the reconstruction of the dam in 1961. Injury did not occur until 1973, when the dam broke for the second time. Damages recoverable under section 235 of our Constitution, however, are only those capable of being ascertained at the time the city's works are being constructed or enlarged. Johnson v. City of Birmingham, 25 Ala.App. 389, 147 So. 452 (1933), citing Hamilton v. Alabama Power Co., 195 Ala. 438, 70 So. 737 (1915). This Court has held that damages occurring subsequent to the time of taking are not recoverable:
"`The injuries complained of did not exist, nor could the damages therefor be ascertained upon the construction of the dam, but arose subsequent thereto as the result of the maintenance of same in conjunction with subsequent intervening cause. In other words, the injuries complained of were not capable of being ascertained at the time the dam was constructed, or even so reasonably contemplated as to authorize payment or security therefor as provided by said section 235 at the time of the construction or enlargement of the ways, works, etc.' Meharg v. Alabama Power Co., 201 Ala. 555, 556, 78 So. 909, 910 (1918), accord City of Bessemer v. Chambers, 242 Ala. 666, 8 So.2d 163 (1942).
"In Hunter v. City of Mobile, supra, the plaintiffs were allowed to waive the tort and recover under an implied contract based upon section 235, but that case can be distinguished because in Hunter the tortious conduct and the `taking' were concurrent. The value of the plaintiffs' commercial property was diminished by the construction of the Bankhead Tunnel in front of their property on Government Street.
"We conclude that the injury to plaintiffs caused by the collapse of the Woodland Hills Dam was not ascertainable at the time of the alleged taking 12 years earlier and was not the type of taking, injury or destruction contemplated by section 235. While we recognize that the remedial nature of the section suggests its liberal construction, to allow so broad a field of operation as the plaintiffs would have us adopt would allow a contract action in every case of alleged negligent construction or maintenance by a municipal corporation. This result, we feel, is not mandated by our constitution or by this Court's prior decisions."
361 So.2d at 1079-80.
Because the supreme court has held that inverse condemnation is an implied contract, we hold that the trial court did not err in charging the jury that it must choose between the theories of negligence and inverse condemnation. Although inverse condemnation requires that the property owner establish a causal relationship between the city's activity and the property loss complained of, negligence is not a requirement of § 235. Rather, § 235 focuses on the damage to the property, regardless of fault. Section 235 provides *232 a remedy for unintended damage to private property caused by the city's construction of a public project, and the public, i.e., the users of the city's public project, should pay for such damage instead of the private property owner.
The judgment of the trial court is affirmed, except insofar as it awarded mental-anguish damages to Frances Lester, Ann Thurston, and Elizabeth Van Antwerp; the awards of mental-anguish damages to those three plaintiffs are reversed. The case is remanded for the trial court to enter a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, J., concurs.
CRAWLEY and THOMPSON, JJ., concur in the result.
MURDOCK, J., concurs in part and dissents in part.
CRAWLEY, Judge, concurring in the result.
To prove their claims alleging inverse condemnation, the plaintiffs were required to prove that the City's repair work caused the damage to their homes. They were not required to prove that the City had a duty to the plaintiffs and that the City breached that duty. I agree with Presiding Judge Yates that the plaintiffs proved causation, but I question whether they proved breach of a duty by the City. Thus, I question whether the negligence claim should have been submitted to the jury.
On appeal, however, the City focuses solely on the causation issue and does not contest the issues of duty and breach. Accordingly, I conclude that the City has waived any challenge to the sufficiency of the plaintiffs' proof of negligence. Therefore, I concur in the result affirming the judgment entered on the negligence verdict.
MURDOCK, Judge, concurring in part and dissenting in part.
I concur in the majority's treatment of the mental-anguish awards in this case, but I dissent as to the majority's affirmance of the trial court's limitation of each plaintiffs' property-damage award to $100,000.
Section 235 of the Alabama Constitution of 1901 provides that landowners whose property has been "taken, injured, or destroyed by the construction or enlargement of [a municipality's] works, highways, or improvements" are entitled to just compensation. I believe that the trial court erred in giving an instruction that it was up to the jury, if it found in the plaintiffs' favor, to choose between returning a verdict on the plaintiffs' negligence claims and returning a verdict on their inverse-condemnation claims under § 235.
Expert evidence indicated that the City's construction of an enlarged and more effective drainage system for Dauphin Street caused the groundwater level under the plaintiffs' homes to drop, and that that drop in groundwater caused the plaintiffs' homes to be damaged through settlement. The City's conduct therefore was actionable both under common-law negligence principles (i.e., the negligent removal of subjacent support for the plaintiffs' homes) and under § 235 as a "taking" or "injury" to the plaintiffs' property. Put another way, the negligence and the § 235 claims were not mutually exclusive theories.
Although the majority states that our Supreme Court "has held that inverse condemnation is an implied contract," inverse condemnation also sounds in tort. In reversing a trial court's dismissal of an inverse *233 condemnation claim as untimely under a six-month claim statute applicable to "damages growing out of a tort" committed by municipalities, our Supreme Court in Hunter v. City of Mobile, 244 Ala. 318, 13 So.2d 656 (1943), addressed the issue whether a § 235 claim was "in assumpsit or in tort":
"The exact question here for consideration appears never to have been directly presented for decision in this Court. Many authorities are to be found noted in 30 C.J.S., Eminent Domain, § 395, p. 105 and 44 C.J., p. 473. Some of the authorities go so far as to hold the only right of action is assumpsit, based upon an implied contract to compensate the owner for property thus injured, taken, or destroyed.
". . . .
"A consideration of our own authorities discloses that in cases of this character a tort action has been sustained. Dallas County v. Dillard, 156 Ala. 354, 47 So. 135 [(1908)]; Highland-Ave. & Belt R. Co. v. Matthews, 99 Ala. 24, 10 So. 267 [(1892)]; Hamilton v. Alabama Power Co., 195 Ala. 438, 70 So. 737 [(1915)]...."
244 Ala. at 320-21, 13 So.2d at 657-58. Nonetheless, the Court explained that the plaintiffs before it could avoid a statute of limitations bar by waiving their claims in tort under § 235 and pursuing their claims as claims in contract under § 235:
"Conceding, therefore, that our decisions justify a tort action, yet there is nothing in any of them which militates against the conclusion that the property owner may, if he desires, waive the tort and sue in assumpsit."
244 Ala. at 321, 13 So.2d at 658. Our Supreme Court then adopted the following reasoning of the Virginia Supreme Court in Nelson County v. Loving, 126 Va. 283, 101 S.E. 406 (1919):
"`We are of the opinion that but for the statute law aforesaid, which affords an adequate remedy for the recovery of claims against the counties, either an action of indebitatus assumpsit would lie on the quasi contract implied in law from the obligation imposed on the defendant county by the constitution to make "just compensation" in the premises... or an action of trespass on the case would lie.... Accurately speaking, the cause of action in each of the cases before us arose from the disturbance or violation of the plaintiff's right which the law created as aforesaid, which is a tort...; but in such case a plaintiff, under the well-settled rule on the subject, may waive the tort and sue in assumpsit on the contract which the law implies.'"
Hunter, 244 Ala. at 322, 13 So.2d at 659 (quoting Nelson County, 126 Va. at 299-300, 101 S.E. at 411 (citing Dallas County v. Dillard, supra)).
Mahan v. Holifield, 361 So.2d 1076 (1978), confirmed that a § 235 action sounds both in contract and in tort:
"[Section 235] has been interpreted to support a cause of action by a private landowner whose property is taken or damaged by a municipality as a consequence of its acts of construction or enlargement. In such actions, the property owner may waive the tort and sue in assumpsit for compensation. Hunter v. City of Mobile, 244 Ala. 318, 13 So.2d 656 (1943)."
Mahan, 361 So.2d at 1079.
Consistent with an inverse condemnation's fundamental character as a claim sounding in tort, as well as contract, there is nothing in § 235 that prevents recovery on an inverse-condemnation claim where the construction or enlargement of a public works is done negligently. A "taking," whether inherent to the nature or scope of *234 the construction or as a result of that construction being performed in a negligent manner, is nonetheless a taking resulting from that construction. See, e.g., McMahan's of Santa Monica v. City of Santa Monica, 146 Cal.App.3d 683, 194 Cal.Rptr. 582 (1983) (cataloging cases in which negligent conduct by governmental entities resulting in the taking of or damage to homes or other property constituted inverse condemnation); O'Gara v. City of Dayton, 175 Ky. 395, 194 S.W. 380 (1917) (holding that damages for inverse condemnation were awardable where city contractor negligently constructed sewer in a manner which removed subjacent support from plaintiff's home). "The mere fact that a landowner has the ability to sue under the state's tort claims act does not... preclude the landowner from suing for a taking or damaging." 27 Am.Jur.2d Eminent Domain § 825 (1996). "An action may successfully be prosecuted against governmental bodies for damages occurring from negligence in the performance of such public work as the planning, construction, repair, and maintenance or operation of public projects ... [on] the theory ... that what was done constitutes a `taking or damaging,' ... of private property for public use." 27 Am.Jur.2d Eminent Domain § 837 (1996); 2 A.L.R.2d 677 § 2 (1948) (cataloging cases in which damage to private property caused by negligent planning or execution of public works projects constituted a "taking" in constitutional sense).
Accordingly, I conclude that there was nothing whatsoever inconsistent in the plaintiffs' alternative theories of recovery for negligence and for compensation under § 235. Obviously, had the jury returned a verdict in favor of the plaintiffs on both counts, the trial court would have been responsible for entering a judgment that would have avoided a double recovery. In this case, however, the trial court instructed the jury that the jury must choose for the plaintiffs upon which of the plaintiffs' two alternative theories of recovery, if either, an award would be made. Such an instruction would have been appropriate only if damage to or destruction of property resulting from the negligent manner in which construction or enlargement of a public work or highway is designed or performed did not constitute a taking for purposes of § 235.[3]
Because the plaintiffs' alternative claims alleging negligence and seeking damages for inverse condemnation under § 235 of our Constitution were not mutually exclusive, the trial court erred in instructing the jury as it did. The plaintiffs were entitled to go to the jury on both theories. In First National Bank of Gadsden v. Morgan, 213 Ala. 125, 104 So. 403 (1925), our Supreme Court considered whether a claim for trover, sounding in tort, could be *235 prosecuted along with a claim for money had and received, sounding in assumpsit, where a bank had been overpaid for a debt. The Supreme Court rejected the bank's insistence that the two claims could not be joined:
"Whether, and in what cases, the doctrine of election applies as to counts in the same suit is not presented by this record. Conceding, without deciding, that, where it affirmatively appears from the pleading the existence of the cause of action in one count depends upon the waiver of the cause of action stated in another, or where the same situation develops from the evidence in the cause, the measure of damages being different, an election may be required by the court, there was evidence in this cause in support of each count, regardless of the waiver of a tort. Plaintiff was entitled to go to the jury on both."

213 Ala. at 127-28, 104 So. at 405. To like effect is Tuscaloosa Motor Co. v. Cockrell, 272 Ala. 387, 132 So.2d 745 (1961), in which the Supreme Court held that counts of deceit (tort) and money had and received (assumpsit) could be joined, noting:
"`A plaintiff may state his action in any legal form he wishes, and in as many counts as are necessary, and though his complaint contains several counts in different aspects, so that he may not recover on all of them, the jury may be instructed that they may find for the plaintiff upon any aspect alleged in the several counts which may be properly sustained by the evidence, upon proper instructions as to burden of proof and elements of recovery on the counts in each aspect. ... The rule sought to be invoked by appellant [requiring election of inconsistent remedies] does not apply to this situation.'"
272 Ala. at 389, 132 So.2d at 748 (emphasis added; quoting Sovereign Camp, W.O.W. v. Carrell, 218 Ala. 613, 614-15, 119 So. 640, 641 (1928)). If anything, the Alabama Rules of Civil Procedure have only strengthened these precepts. See Ala. R.Civ.P., Rule 8 (permitting demands for relief "in the alternative or of several different types" and statements of "as many separate claims ... as the party has regardless of consistency") and Rule 18 (permitting liberal joinder of "independent" or "alternate" claims and joinder of remedies).
By injecting the principle of election into the deliberations of the juryindeed, delegating that "election" to the jurythe trial court short-circuited the plaintiffs' right to maintain their parallel theories of recovery up to and including the rendition of the jury's verdict, and thus to choose their ultimate theory of recovery. "Where a party tries a case on alternative theories of recovery and favorable findings are made on two or more theories, [that party] is entitled to a judgment on the theory providing the greatest or most favorable relief." 28A C.J.S. Election of Remedies § 6 (1996).
I therefore respectfully dissent as to the portion of the majority's opinion approving of the manner in which the trial court instructed the jury as to the mutual exclusivity of the plaintiffs' inverse-condemnation and negligence theories for recovery.
Although, in a case such as this, a remand for a new trial ordinarily might be in order, in this case, a remand is not necessary and would be a waste of judicial time and resources. The jury already has determined the total amount of damages sustained by each of the plaintiffs' homes. Thus, all of the required elements for the entry of judgment pursuant to § 235 either have been determined by the jury or are not contested. See, e.g., Jackson v. Parker, 34 Ala.App. 434, 40 So.2d 647 (1948), rev'd on other grounds, 252 Ala. *236 167, 40 So.2d 649 (rendering a judgment in favor of the plaintiff where the evidence on appeal was without conflict). See also Prow's Motel, Inc. v. Minnesota, 294 Minn. 345, 200 N.W.2d 910 (1972) (electing to reinstate original verdict awarding damages for an inverse condemnation, rather than remanding to the trial court, where all issues had been submitted to and resolved by a jury or, subsequently, by the trial court); Summerlin v. Tramill, 290 So.2d 53, 55 (Fla.1974) (remanding with instructions to reinstate trial court's judgment, rather than conduct a new trial, where the trial court had erroneously charged the jury on only gross negligence and the jury had returned a verdict for the plaintiff, reasoning that "a new trial, at this time, based upon simple negligence... should obviously result in a similar judgment for petitioner"). Accordingly, I would remand only for the purpose of instructing the trial court to enter a judgment in favor of the plaintiffs for the full amount of their respective property damages, as determined by the jury, and to make an award of litigation expenses pursuant to Ala.Code 1975, § 18-1A-32.
NOTES
[1] In support of this argument, the City cites to R.T. 34, 100-92 MAF. (Two court reporters were used and the parties distinguished between the two with their initials.) Page 34 is a page of Wood's testimony. As we explain later in the opinion, Wood refutes this argument. The City's second cite to R.T. 100-192 contains the cross-examination testimony of Dr. Olsen, from pages 100 to 105, wherein Dr. Olsen also refutes the City's argument. The remainder of the transcript cited by the City in support of its contention regarding organic soil refers to the testimony of a realestate appraiser (R.T. 105-122), the testimony of a geotechnical engineer (R.T. 122-176), a motions-and-charge conference between the lawyers and the judge (R.T. 176-191), and the court's remarks to the jury (R.T. 191-192). It is not the duty of an appellate court to search the record in order to determine if it contains evidence that will sustain a contention. Quality Truck & Auto Sales, Inc. v. Yassine, 730 So.2d 1164 (Ala.1999), citing Totten v. Lighting & Supply, Inc., 507 So.2d 502 (Ala.1987).
[2] The Thurstons had had prior repairs to their home because of a broken sewer line in 1987. However, the City makes no argument regarding their repairs.
[3] The question may also be framed as whether injury to, or destruction of, property in connection with the construction, but not necessitated by it, is compensable as a taking under § 235. The trial court's instruction assumes that the answer to this question is in the negative, i.e., that either (i) the type of drainage pipe used and other aspects of the design and construction of the improvements at issue (and the resulting injuries to the plaintiffs' homes) were necessary for the City to effectively rebuild the street in front of the plaintiffs' homes, in which case the City's actions would be compensable under § 235, or (ii) such enlarged pipe or other aspects of the design or construction (and the resulting injuries to other plaintiffs' homes) went beyond what was necessary in order to effectively rebuild the street, in which case the City's actions would not be compensable under § 235, but could be the basis for a negligence action. The answer to the question, however, is otherwise: "the plaintiff[s'] right of action [under § 235] is not dependent on ... whether the improvements made by the city did or did not exceed the existing necessities." McEachin v. City of Tuscaloosa, 164 Ala. 263, 51 So. 153 (1909) (emphasis added).